## BUFCO CORPORATION, et al., Petitioners

v.

## NATIONAL LABOR RELATIONS BOARD, Respondent,

International Brotherhood of Electrical Workers, AFL–CIO, Local 16, Intervenor.

No. 97–1401.

United States Court of Appeals, District of Columbia Circuit.

Argued April 7, 1998.

Decided June 26, 1998.

Maurice Baskin argued the cause for petitioners. With him on the briefs was John C. Hardwick, Jr.

Robert J. Englehart, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Margaret A. Gaines, Supervisory Attorney. Frederick Havard, Supervisory Attorney, entered an appearance.

Charles L. Berger argued the cause and filed the brief for intervenor International Brotherhood of Electrical Workers, AFL–CIO, Local 16.

Before: WALD, GINSBURG, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

This is a petition for review of a supplemental decision and order of the National Labor Relations Board affirming an Administrative Law Judge's calculation of the amount of a back pay award. The Board has filed a cross-application for enforcement of its order. We sustain the Board's refusal to toll interest on the award, and uphold the Board's hiring hall remedy and its decision to pierce the corporate veil. We reject the Board's determination that four disputed employees performed bargaining unit work, and thus were entitled to back pay, and we vacate and remand the Board's approval of a back pay award calculated on a weekly basis.

I

Corbett Electric Company, Inc., and Bufco Corporation are Indiana corporations closely held by the Corbett family.[1] For more than thirty years, Corbett Electric operated as an electrical contractor in the construction industry. As a member of the National Electrical Contractors Association ("NECA"), it entered into two multiemployer collective bargaining agreements recognizing Local 16, International Brotherhood of Electrical Workers as the exclusive bargaining representative for its employees in its residential and commercial electrical units.[2] Bufco was

---

1. Bill Corbett is the sole owner of Corbett Electrical. Initially he was also the sole owner of Bufco, but on August 1, 1982, he transferred 49 shares of Bufco to his wife Lucinda and the remaining 51 shares to his son Mark.

2. The collective bargaining agreements were prehire agreements negotiated under § 8(f) of the National Labor Relations Act, 29 U.S.C. § 158(f).

Section 8(f) "allows employers in the building and construction industry to bargain with a union without an initial election or showing of majority support." *Bentson Contracting Co. v. NLRB*, 941 F.2d 1262, 1263 (D.C.Cir.1991). Both agreements provided that the Union was to be "the sole and exclusive source of referral of applicants for employment."

incorporated in 1970 and began engaging in construction work on single-family and multi-family housing projects. In 1977, Bufco ceased its construction work and lay dormant for a number of years thereafter.

In the summer of 1982, Corbett Electric terminated its membership in NECA and informed the Union that it was repudiating both the residential and commercial bargaining agreements. On December 9, 1982, the Union filed unfair labor practice charges with the Board against Corbett Electric. Shortly thereafter, the Corbetts resurrected Bufco and it began performing electrical contracting work. In response, the Union filed charges against Bufco.

The Board found that Bufco was the alter ego of Corbett Electric and that both companies had violated Sections 8(a)(5) and (8)(a)(1) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(5) and 158(a)(1), by repudiating the collective bargaining agreements and by transferring electrical work from Corbett Electric to Bufco in order to avoid contractual obligations. *See Bufco Corp. v. I.B.E.W., AFL–CIO, Local 16*, 291 N.L.R.B. 1015 (1988). The companies had withdrawn recognition of the Union, discontinued contractually required payments to benefit plans on behalf of employees, and changed employees' contractually specified wage rates. As part of its remedy, the Board ordered Corbett Electric and Bufco to "make whole ... employees for any loses they may have suffered." 291 N.L.R.B. at 1017. The Seventh Circuit enforced the Board's decision and order in full. *See NLRB v. Bufco Corp.*, 899 F.2d 608 (7th Cir.1990) ("*Bufco I*").

A back pay specification to remedy the effects of Corbett Electric/Bufco's unfair labor practices resulted in hearings before another ALJ, who recommended piercing the corporate veil in order to hold liable individual members of the Corbett family. The Board affirmed and entered an award of $136,556 plus interest against Bill, Lucinda, and Mark Corbett, Bufco Corporation, Corbett Electric Company, and Mar Beck, Inc., a third corporation owned by the Corbetts—all of whom are petitioners. *See* 323 N.L.R.B. No. 104 (1997).

## II

One of Bufco's complaints is that the Board refused to toll interest "during the periods of delay caused by the NLRB." ALJ Sherman rendered her unfair labor practice decision against Corbett Electric/Bufco in 1984, but the Board did not act until 1988. In the interim, the Board decided *John Deklewa & Sons, Inc. v. International Ass'n of Bridge, Structural and Ornamental Iron Workers, Local 3, AFL–CIO*, 282 N.L.R.B. 1375 (1987), altering its analysis of § 8(f) collective bargaining relationships. When the Board affirmed Judge Sherman, it applied *Deklewa* retroactively. After the Seventh Circuit sustained the Board, *Bufco I*, 899 F.2d at 609, the parties were unable to agree on the amount of back pay due. Lengthy supplemental back pay proceedings ensued. The Board issued its order fixing the amount of back pay due on April 30, 1997. The principal amount of the award is $136,556, but Bufco asserts that once interest is calculated, the total amount may exceed $300,000.

■ Although some of the delay may be attributable to the Board, that in itself cannot serve as a basis for tolling the award of interest. The Supreme Court has held that "the Board is not required to place the consequences of its own delay, even if inordinate, upon wronged employees to the benefit of wrongdoing employers." *NLRB v. J.H. Rutter–Rex Mfg. Co.*, 396 U.S. 258, 263, 90 S.Ct. 417, 24 L.Ed.2d 405 (1969). During the delay, Bufco had use of money rightfully belonging to its workers. "The return on the money belongs to the victim, not the wrongdoer, and interest is the means by which this transfer is accomplished." *NLRB v. International Measurement & Control Co.*, 978 F.2d 334, 337 (7th Cir.1992); *see also NLRB v. Thill, Inc.*, 980 F.2d 1137, 1141 (7th Cir. 1992); *Bagel Bakers Council v. NLRB*, 555 F.2d 304, 306 (2d Cir.1977). For these reasons, we decline to follow *NLRB v. W.L. Miller Co.*, 871 F.2d 745 (8th Cir.1989), which on similar facts concluded that it would be manifestly unjust to award interest for the

entire period.[3]

■ Bufco also challenges the award of back pay to hiring hall applicants. These are would-be employees who were denied the opportunity to work for Bufco when the company repudiated its collective bargaining agreements and circumvented the Union's hiring hall.[4] According to Bufco, neither ALJ Sherman nor the Board discussed hiring hall applicants before the case reached the Seventh Circuit. From this Bufco concludes that the court's decision in *Bufco I*, granting enforcement of the Board's order, "constitutes the law of the case" and precludes an award to such applicants. There are several flaws in Bufco's reasoning. For one thing, the only issues the Seventh Circuit addressed, or had to address, dealt with the Board's decision to apply *Deklewa* retroactively, *see Bufco I*, 899 F.2d at 610. The Board's unfair labor practice decision, which the court reviewed, had left open the precise remedy to be imposed, requiring only that Bufco make "employees whole for any losses they *may* have suffered." 291 N.L.R.B. at 1017 (emphasis added). Deferring the remedy to the back pay proceeding is common practice for the Board, a practice the Supreme Court and the courts of appeals have approved. *See Sure–Tan, Inc. v. NLRB*, 467 U.S. 883, 902, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984); *Manhattan Eye, Ear & Throat Hosp. v. NLRB*, 942 F.2d 151, 156 (2d Cir.1991). For another thing, Bufco misreads the underlying proceedings. Hiring hall applicants were indeed considered. ALJ Sherman found that the bargaining agreements between the Union and NECA "contained clauses that required employer members of the Association to hire employees through the Union's referral service." She further found that Corbett Electric "used the Union as a hiring hall to obtain Corbett Electric's employees." Noting that "some of the beneficiaries of the Order may be employees who will never work for Corbett Electric/Bufco but who work out of the Union's hiring hall and would have been referred to jobs with Corbett Electric/Bufco if the bargaining agreements had been honored," the ALJ ordered notices to be posted "at all locations where notices to employees who work out of the hiring hall are customarily posted." The Board's order approved this remedy. Furthermore, even if no explicit mention had been made of these bypassed job applicants, a hiring hall remedy is standard fare in cases involving unlawful failure to abide by collective-bargaining agreements. *See Wayne Electric, Inc.*, 226 N.L.R.B. 409 n. 3 (1976). In *Southwestern Steel & Supply, Inc. v. NLRB*, 806 F.2d 1111 (D.C.Cir.1986), we upheld a Board order "requiring compensation for unit members who would have been employed by the Company had it hired in conformity with the provision." *Id.* at 1114. "Even when the Board does not expressly extend its make-whole order to would-be employees ... the order is understood to encompass them." *Id.* (citations omitted). The Board's order here directed Bufco to "make whole" employees "for any losses they may have suffered." Hiring hall applicants who were unlawfully denied employment suffered losses for which Bufco is liable. We therefore sustain this aspect of the Board's remedy.

■ There is nothing to Bufco's related claim that the remedy should not include hiring hall counterparts for the work performed by Bill and Mark Corbett. The commercial collective-bargaining agreement has a clause stating that "[n]o member of any firm signatory to this Agreement shall himself perform any manual electrical work." It was reasonable for the Board to find that Bill Corbett, as the owner of Bufco's alter ego Corbett Electric, was a "member" of Bufco itself. As to Mark Corbett, Bufco argues that "the bulk of his work" was residential and that the residential agreement contains

---

3. The Seventh Circuit, in *Bufco I*, "express[ed] no opinion on the Eighth Circuit's finding" in *Miller*. 899 F.2d at 612 n. 8.

4. "The original paradigmatic hiring hall involved an actual hall or facility from which the union operated a full-fledged employment agency, screening prospective workers, building and maintaining lists of eligible workers, and dispatching those workers in response to employer requests. Today's hiring hall [is] more accurately described as a 'referral system....'" *Pittsburgh Press Co. v. NLRB*, 977 F.2d 652, 657 (D.C.Cir.1992).

no such clause. Substantial evidence, however, supports the Board's conclusion that the majority of Mark Corbett's work was commercial and thus covered by the clause in that agreement. In the supplemental proceeding before ALJ West, Bufco argued that 15 percent of Mark Corbett's hours were residential, meaning, of course, that 85 percent were commercial. Moreover, Bill Corbett testified that most of Mark's jobs were in "the commercial category."

■ We also uphold the Board's decision to pierce the corporate veil and hold Bill, Lucinda, and Mark Corbett jointly and severally liable for the missteps of Corbett Electric and Bufco. In making such a decision, the Board typically applies a test derived from federal common law: (1) have the shareholder and the corporation failed to maintain separate identities? and (2) would adherence to the corporate structure sanction a fraud, promote injustice, or lead to an evasion of legal obligations? *See White Oak Coal Co.*, 318 N.L.R.B. 732 (1995); *see also NLRB v. Greater Kansas City Roofing*, 2 F.3d 1047, 1052 (10th Cir.1993); *Labadie Coal Co. v. Black*, 672 F.2d 92, 96 (D.C.Cir. 1982).[5]

The Board's factual findings must be respected if they are supported by "substantial evidence on the record considered as a whole," 29 U.S.C. § 160(e); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951), and the Board's legal conclusions will stand unless the Board acted arbitrarily or otherwise erred in applying established law to the facts. Here there is ample support for the Board's conclusion that the Corbetts failed to respect corporate form. Although the Corbetts say they "conducted and recorded all corporate meetings" and kept "audited financial records," there is also evidence that they commingled funds and did not maintain an arms-length relationship in their corporate transactions. In the supplemental back pay proceeding, ALJ West found especially suspicious a lease between Bufco and Marbeck Development Company, another company owned by the Corbetts.[6] After years of paying only minimal rent, Bufco paid Marbeck $50,000 on January 31, 1990. This sum was deposited not in Marbeck's account but in the personal account of Lucinda Corbett. Bufco also forgave a $41,381 debt of Marbeck's, evidently in lieu of back rent. This was apparently money Bufco could ill afford because in February 1990, it took out a loan of $40,000. In light of these transactions, there was ample support for ALJ West's conclusion, sustained by the Board, that the real property lease was a "sham" used to dissipate Bufco's assets.

As ALJ West wrote, "The natural, foreseeable, and inevitable consequences of the Corbett's misuse of corporate assets is the diminished ability of the corporate alter egos to satisfy the involved statutory remedial obligations." Although there is no evidence concerning Bufco's solvency, the Board was warranted in believing that adherence to corporate form in this instance could very well "lead to an evasion of legal obligations," *Greater Kansas City Roofing*, 2 F.3d at 1052, sufficient to justify piercing the corporate veil.

### III

Bufco's remaining challenges relate to two aspects of the Board's back pay order—the calculation of back pay on a weekly basis, and the inclusion of four direct employees whom, according to Bufco, did not perform unit work.

■ Under § 10(c) of the National Labor Relations Act, 29 U.S.C. § 160(c), once the Board finds that an unfair labor practice has been committed, its choice of remedies includes the power to order an award of back pay. While the Board has wide latitude in "devising procedures and methods which will effectuate the purposes of the Act," it must fashion a remedy that will yield a close approximation of the amount due. *NLRB v.*

---

5. Piercing the corporate veil "is a question of federal law when it arises in the context of a federal labor dispute." *NLRB v. Fullerton Transfer & Storage, Ltd.*, 910 F.2d 331, 335 (6th Cir. 1990).

6. Elsewhere, the NLRB describes this company as "Mar Beck, Inc."

*Brown & Root, Inc.,* 311 F.2d 447, 452 (8th Cir.1963); *see also NLRB v. Laredo Packing Co.,* 730 F.2d 405, 407 (5th Cir.1984); *Bagel Bakers Council,* 555 F.2d at 305. In this case, ALJ Sherman ordered loss of wages "to be calculated in the manner prescribed in *F.W. Woolworth Co.*" The Board modified Judge Sherman's remedy, ordering "Respondents to make whole, as prescribed in *Ogle Protection Services,* ... employees for any losses they may have suffered." In a footnote, the Board explained:

> The judge ordered a quarterly computed back pay remedy. As we find that Bufco is the alter ego of Corbett, that the two entities constitute a single employer, and that the appropriate units include the employees of both companies covered by the inclusionary language of the residential and [commercial] agreements with the Union, we conclude that the appropriate remedy is to require Respondent to apply the contracts retroactively and to make its employees whole for any losses they may have suffered as a result of Respondent's failure to apply the contracts. When, as here, the amounts due employees result from a Respondent's repudiation and failure to apply the terms of a collective-bargaining agreement, and does not involve cessation of employment status or interim earnings, a quarterly computation is unnecessary and unwarranted.

In the supplemental compliance proceeding that followed, ALJ West ordered, and the Board approved, back pay for Bufco's direct employees computed on a weekly basis. (The back pay for hiring hall applicants was determined according to a different formula.) He justified calculating back pay on a weekly basis because employees were paid weekly and thus the company's "own weekly cash-flow problems were alleviated at the expense of the employee's weekly cash flow problems." Before the Board and in this court, Bufco argued that *Ogle Protection Services* required back pay to be computed on an overall or lump sum basis, with excess pay in any given week credited to the next.[7] The dispute then centers on the difference be-

tween *Ogle Protection Services* and *F.W. Woolworth* and how the difference affects the calculation of back pay.

In *F.W. Woolworth,* 90 N.L.R.B. 289 (1950), the Board announced what was then a new method of calculating a back pay award. Although previously back pay had been determined "by computing the difference between (a) what the employee would have earned in the position which was discriminatorily terminated and (b) what he actually earned in other employment during the entire period commencing on the date of discrimination and ending with the date of offer of reinstatement," the Board reasoned that this method gave employers an incentive to refrain from offering reinstatement because "the greater the delay, the greater would be the reduction in back pay liability." 90 N.L.R.B. at 291–92. The Board therefore ordered that loss of pay should be computed on the basis of separate quarterly periods. "Earnings in one particular quarter shall have no effect upon the back-pay liability for any other quarter." *Id.* at 293. The Supreme Court upheld the Board's methodology in *NLRB v. Seven–Up Bottling Co.,* 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377 (1953).

Thereafter, in *Ogle Protection Services,* 183 N.L.R.B. 682 (1970), the Board concluded that the quarterly computation method should not be applied to employees who had not been unlawfully discharged and had no interim employment earnings to offset back pay liability. 183 N.L.R.B. at 683. Thus, in cases involving the repudiation of a collective-bargaining agreement—where employees continue to be employed but are not paid according to the union scale—the Board does not use a quarterly computation method. *See, e.g., Proctor Express Inc.,* 322 N.L.R.B. 281, 282 n. 7 (1996) ("In the event unit employees were laid off or terminated ... backpay shall be computed in the manner set forth in *F.W. Woolworth Co.*.... In the event that unit employees ... were neither laid off nor terminated, backpay shall be computed in accord with *Ogle Protection Service[s].*"); *Louisiana–Pacific Corp.,* 312 N.L.R.B. 165, 167 n. 11 (1993) (same).

---

7. Because Bufco was not paying its employees union wages, it contends that in some weeks it

paid more than what the employees otherwise would have earned.

The Board maintains that "nothing in the language of *Ogle Protection* either forbids the weekly approach the Board used here or requires the lump-sum approach Bufco advocated. *Ogle Protection* simply does not speak to the period of time that the Board must use in lieu of quarterly computations." Perhaps so, but we are still left with a problem. While *Ogle Protection Services* may not mandate a lump sum approach, it casts doubt on the use of any segmented periods to calculate back pay, regardless whether the period is quarterly, weekly or monthly. If *Ogle* is read to mean "anything-but-quarters," as the Board seems to suggest, we cannot understand the rationale behind it. Given this analytical gap, we will vacate the Board's back pay computation and remand the case for reconsideration and a more adequate explanation. *Pittsburgh Press Co. v. NLRB,* 977 F.2d 652, 655 (D.C.Cir.1992); *see also Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 57, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). On remand, the Board should explain how calculation of back pay on a weekly basis accomplishes the objectives of *Ogle Protection Services* in light of *Ogle's* rejection of the *F.W. Woolworth* quarterly formula. *See Checkosky v. SEC,* 23 F.3d 452, 483–84 (D.C.Cir. 1994) (separate opinion of Randolph, J.).

We also deny enforcement of the portion of the Board's order awarding back pay to four direct employees—Newman Corbett, Timothy Stewart, Roger Hart, and Clifford Russell—and their hiring hall counterparts. Bufco maintains that these individuals did not perform any bargaining unit electrical work.[8] The evidence the Board cited is exceedingly thin, identifying by name just three of the employees. The Board relies first on the testimony of a regional compliance officer, Patricia Nachand. On cross-examination, however, Nachand testified only that she had discussed Newman Corbett, Roger Hart, and Timothy Stewart in her conversation with Lucinda Corbett. She appears to have responded affirmatively to the question, "[I]sn't it true that ... Mrs. Corbett ... told you on several occasions that Newman Corbett, Roger Hart and Timothy Stewart did not perform unit work?" At oral argument, counsel for the Board also directed us to the testimony of Mark Corbett, who stated that all of the employees he named performed electrical or "electrical-related" work. But as the Board's counsel admitted, Mark Corbett was not referring to the disputed employees. In fact, earlier in his testimony, he said that Tim Stewart performed labor-related support help.[9]

■■ The Board thinks negative inferences should be drawn from Bufco's failure to call its own witnesses on this issue. Under the "missing witness" rule, if a person having important evidence and peculiarly within the power of one of the parties to produce is not called, the factfinder may draw an inference that "the missing witness would have given testimony damaging to that party." *United States v. Pitts,* 918 F.2d 197, 199 (D.C.Cir.1990). Here, the Board could have called at least some of the disputed employees as witnesses [10] and so drawing the inference would be unwarranted even if this factor would have supplied substantial evidence to support the Board, which we doubt. The Board's own precedents recognize as much. *See Plumbers & Steamfitters Local,* 242 N.L.R.B. 1157, 1160 n. 10 (1979) ("[S]ince there is no basis for inferring [the witness] was not equally available to both sides, no adverse inference can be drawn."); *Weisser Optical Co.,* 274 N.L.R.B. 961, 961 n. 4 (1985) (same).

■ The Board tells us the case is not really about substantial evidence, but about which party bears the burden of proof. True enough, in a back pay proceeding, the Board has discharged its burden once it shows the gross amount of back pay due. The burden then shifts to the employer to establish affirmative defenses mitigating liability. *See*

---

8. ALJ West's decision lists only three of the four disputed workers, but awards all four back pay.

9. Bill Corbett testified that these four employees did not perform any electrical work, but the ALJ discredited his testimony.

10. Newman Corbett passed away prior to the hearing before the ALJ.

*NLRB v. Laredo Packing Co.,* 730 F.2d at 407; *NLRB v. Brown & Root, Inc.,* 311 F.2d at 454; *NLRB v. Mooney Aircraft, Inc.,* 366 F.2d 809, 813 (5th Cir.1966). Still, the Board must show "the gross back-pay due *each claimant*," *J.H. Rutter Rex Mfg. Co. v. NLRB,* 473 F.2d 223, 230 (5th Cir.1973) (emphasis added), not gross back pay liability for the wronged employees as an undifferentiated whole. Establishing that an employee is actually a member of a given bargaining unit is part of the Board's prima facie case. There is no gross back pay liability for an employee who is not within the relevant bargaining unit. It is not far-fetched to assume that Bufco hired employees—managers, carpenters, drivers, and so forth—who performed jobs other than residential or commercial electrical work. Since the Board failed to make out a prima facie case with regard to these four employees, we deny enforcement of this part of the Board's order. Consequently, we also deny enforcement of the order awarding back pay to the hiring hall counterparts of these employees.

\*  \*  \*

The Board's cross-application to enforce its order is granted with respect to the accumulation of interest, the hiring hall remedy, and piercing the corporate veil. As to the four disputed employees, we deny enforcement of that portion of the Board's order. The calculation of back pay is vacated and remanded to the Board for reconsideration.

*So ordered.*