# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 21, 2011      Decided December 20, 2011

No. 11-1064

DEMING HOSPITAL CORPORATION, DOING BUSINESS AS
MIMBRES MEMORIAL HOSPITAL,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

Consolidated with 11-1095

———

On Petition for Review and Cross-Application for
Enforcement of an Order of the National Labor Relations
Board

———

*Kaitlin Kaseta* argued the cause for petitioner. On the briefs was *Bryan T. Carmody.*

*Milakshmi V. Rajapakse*, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Robert J. Englehart*, Supervisory Attorney. *Julie B. Broido*, Supervisory Attorney, entered an appearance.

Before: BROWN and GRIFFITH, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*:  Deming Hospital Corporation operates Mimbres Memorial Hospital (the "Hospital") in New Mexico.  In 2004, the National Labor Relations Board found the Hospital had acted unlawfully by unilaterally reducing the hours of its full-time respiratory department employees from 40 per week to between 32 and 36 per week.  The Board ordered the Hospital to rescind the hours reduction, bargain with the labor union representing the affected employees (the "Union"), and "make whole any employee for any loss of earnings and other benefits suffered."  *Cmty. Health Servs., Inc.*, 342 N.L.R.B. 398, 404 (2004) (the "2004 Order").  The Tenth Circuit enforced the 2004 Order in full.  *NLRB v. Cmty. Health Servs., Inc.*, 483 F.3d 683, 684 (10th Cir. 2007).

An administrative law judge subsequently determined the Hospital owed 13 current and former employees roughly $105,000 in backpay to compensate them for the unlawful hours reduction.  In reaching this conclusion, the ALJ held, among other things, that the backpay due each employee should not be reduced by any interim earnings the employees may have made from other employment during the backpay period; that employees hired after the unlawful hours reduction were entitled to a remedy under the 2004 Order; and that the Hospital's backpay liability should not be tolled as of the date when it attempted to bargain with the Union, or when the Union assertedly waived bargaining by failing to respond.  In 2011, the Board adopted the ALJ's findings without elaboration and ordered the Hospital to pay up.  *Cmty. Health Servs., Inc.*, 356 N.L.R.B. No. 103 (2011) (the "2011 Order").

3

The Hospital now petitions for review of the 2011 Order, while the Board cross-applies for enforcement. We grant in part the Board's cross-application for enforcement with respect to all issues except the matter relating to interim earnings. The Board did not err in applying a backpay remedy to those employees hired into the bargaining unit after the Hospital unlawfully reduced the employees' hours; and the Board correctly held the Union's failure to communicate with the Hospital did not toll the employer's liability, because the Hospital had not rescinded the unlawful unilateral reduction in hours when it sought to negotiate with the Union. However, the Board did not adequately explain its failure to consider interim earnings when calculating the backpay award. Therefore, we vacate the Board's backpay computation and remand the case so the Board may amplify its position on interim earnings.

I

The narrow question before us is whether the Board calculated backpay in the 2011 Order in accordance with the 2004 Order and relevant precedents. The Hospital contends the answer is no because the Board erroneously: (1) deemed interim earnings irrelevant to the backpay calculation; (2) awarded backpay to employees hired after the unlawful hours reduction; and (3) found the backpay period had not been tolled by the Hospital's unreciprocated efforts to bargain with the Union. We address those arguments in turn.

A

The 2004 Order directs the Board to calculate backpay "as prescribed in *Ogle Protection Service*, 183 NLRB 682 (1970)." *Cmty. Health Servs., Inc.*, 342 N.L.R.B. at 404. In the 2011 Order, the Board found *Ogle* barred its normal

practice of reducing a backpay award to account for "interim earnings"—amounts affected employees made from other jobs during the backpay period. *See Cmty. Health Servs.*, 356 N.L.R.B. No. 103, at \*16. The Board's explanation for that ruling is a non sequitur.

First, a bit of history. Before 1950, the Board calculated backpay by subtracting what an employee actually earned during the entire backpay period from what she would have earned during that period had the unlawful action not occurred. *See Bufco Corp. v. NLRB*, 147 F.3d 964, 970 (D.C. Cir. 1998). The Board came to realize, however, that computing backpay in that manner encouraged employers to delay reinstating wrongfully terminated employees: if the employer waited long enough, the employee could start earning more at her new job than she would have earned at her old job, decreasing the employer's total backpay liability. *See id.* To eliminate this perverse incentive, the Board announced a new approach in *F.W. Woolworth*, 90 N.L.R.B. 289 (1950), under which it subtracted what an employee actually made from what she would have made on a quarterly basis, with the condition that "[e]arnings in one particular quarter . . . ha[d] no effect upon the back-pay liability for any other quarter." *Id.* at 293. Thanks to the *Woolworth* approach, an employer no longer benefitted if a wrongfully terminated employee eventually started making more money at her new job than she would have made at her old job— those additional earnings did not offset what the employer owed in backpay for any previous quarters.

In *Ogle*, the Board carved out an exception to the *Woolworth* approach. Quarterly computation of backpay was deemed "unnecessary and unwarranted" when backpay liability "result[ed] from [an employer's] repudiation and failure to apply the terms of a collective-bargaining

agreement, a violation of the [National Labor Relations] Act which does not involve cessation of employment status or interim earnings that would in the course of time reduce backpay." 183 N.L.R.B. at 683. The Board appeared to assume that an employee who had not been terminated would not seek another job (and thus would not generate interim earnings). And if the employee did not generate any interim earnings, an employer would have no incentive to delay taking corrective action.

We have noted that *Woolworth* and *Ogle*, taken together, establish a clear framework for the calculation of backpay awards: "In the event unit employees were laid off or terminated [*Woolworth* applies]. . . . In the event that unit employees . . . were neither laid off nor terminated [*Ogle* applies]." *Bufco*, 147 F.3d at 970. Here, the Board followed that framework in the 2004 Order by ordering backpay calculated in accordance with *Ogle*. But in the subsequent proceeding to calculate backpay, the Hospital submitted an offer of proof that—contrary to the Board's assumption in *Ogle*—two of the affected employees had in fact taken on additional work at other hospitals to offset the unlawful hours reduction. As a result, the Board had to decide how to calculate backpay under *Ogle* when affected employees *had* generated interim earnings.

In the 2011 Order, the Board chose to ignore interim earnings. It based its decision on the "clear language" of *Ogle*, and its concern that accounting for interim earnings "would have the effect of imposing a duty on employee victims . . . to moonlight in order to minimize the impact of the unlawful conduct for the benefit of the wrongdoer." *Cmty. Health Servs.*, 356 N.L.R.B. No. 103, at *16. Neither rationale withstands our scrutiny.

The "clear language" of *Ogle* does not address the current situation. *Ogle* simply states that if the employer's unlawful action "does not involve . . . interim earnings," then the Board should not calculate backpay on a quarterly basis. 183 N.L.R.B. at 683. *Ogle* does not state the converse proposition—that if the Board cannot calculate backpay on a quarterly basis, then it should not consider interim earnings— and the Board's inference of that proposition from *Ogle* is a logical fallacy. *See Nat'l Treasury Emp. Union v. United States*, 101 F.3d 1423, 1428 n.1 (D.C. Cir. 1996) (noting the converse of a proposition is not necessarily true).

Nor are we swayed by the Board's fear of imposing a "duty to moonlight." The Board's position seems to conflate, and thus confuse, an employee's duty to mitigate with rules governing when backpay should be reduced by interim earnings. Employees who have been unlawfully discharged or laid off from their jobs have a duty to mitigate. *See NLRB v. Madison Courier, Inc.*, 472 F.2d 1307, 1323 (D.C. Cir. 1972) (noting that an employee who has been "improperly deprived" of his position must at least make reasonable efforts to find new employment which is substantially equivalent to the position he has lost). Victims of unfair labor practices who have not lost their jobs have no such duty. *See 88 Transit Lines, Inc.*, 314 N.L.R.B. 324, 325 (1994) (holding the duty to mitigate "makes sense only with respect to employees who have been unlawfully discharged"), *enforced*, 55 F.3d 823 (3d Cir. 1995). Neither the Board nor the Hospital suggest otherwise. But even when there is no duty to mitigate, the Board might in some circumstances be obliged to consider interim earnings to ensure that employees who did choose to find other work do not receive windfalls. *See Grondorf, Field, Black & Co. v. NLRB*, 107 F.3d 882, 888 (D.C. Cir. 1997) (remanding to allow employers to

demonstrate how their contributions to a union benefit fund had to be reduced to avoid improper windfall to the fund).

Moreover, the Board can consider interim earnings without imposing a duty to seek additional employment. Under that approach, a non-terminated employee who seeks out interim earnings after an unlawful hours or wage reduction would have his backpay award reduced by those earnings, but would have the potential to earn more money overall. Meanwhile, a non-terminated employee who chooses not to seek interim earnings would receive his full backpay award (because he had no duty to find additional work), but would forego the potential to make even more money through additional employment. Both outcomes are consonant with the Board's obligations "to ensure that its remedies are compensatory and not punitive, and to guard against windfall awards that bear no reasonable relation to the injury sustained." *Oil Capitol Sheet Metal, Inc.*, 349 N.L.R.B. No. 118, at *8 (2007).

The Board's concern about imposing a duty to mitigate is also belied by its willingness to account for interim earnings in other cases involving relatively small reductions in hours or wages. The Board has ordered make-whole relief "less any net interim earnings" when employees suffered an unlawful 30- to 45-cent decrease in hourly wages, *Atlantis Health Care Grp.*, 356 N.L.R.B. No. 26, at *1 (2010), and when they suffered an unlawful reduction in work hours from 40 to 32 per week, *Amerigas Propane L.P.*, 1997 WL 33315927 (Feb. 12, 1997). In neither case did the Board fret about imposing a "duty to moonlight" on employees who had not been terminated.

The Board now claims its refusal to consider interim earnings is "consistent with well-established precedent,"

Respondent's Br. 19, and cites *88 Transit Lines*, where it chose not to consider interim earnings in a case "involving a violation other than discharge from employment." 314 N.L.R.B. at 325. But in its decision enforcing the Board's order in that case, the Third Circuit included the caveat that it did "not read the [order] to mean that reduction for interim earnings is never appropriate in a nondischarge case," and limited its "holding to approval of the Board's rejection of the need to reduce backpay by interim earnings in this case, where the employees continued to work for the same company and there was no showing that they would not have absorbed the hours stipulated to have been lost by the unfair labor practice." *88 Transit Lines*, 55 F.3d at 827 n.2. That narrow holding does not support the Board's ruling here.

To be clear, we do not hold the Board must consider interim earnings in this case. And because interim earnings "are earnings from employment that is a substitute for employment taken away as a result of unlawful conduct," we do not mean to suggest the Board should consider earnings that did not stem from an employer's unlawful labor practice. *88 Transit Lines*, 314 N.LR.B. at 325. Our holding regarding interim earnings is limited and simple: the Board's explanation for its refusal to consider interim earnings is inadequate, therefore we remand for a more thorough analysis of the issue. *See Bufco*, 147 F.3d at 971 ("vacat[ing] the Board's back pay computation and remand[ing] the case for reconsideration and a more adequate explanation" when the Board's rationale for its decision was unpersuasive). Should the Board choose to consider interim earnings on remand, we also leave to it the task of deciding how to accommodate the various commands of *Ogle*, *Woolworth*, and their progeny.

9

B

The Hospital next claims the Board exceeded its authority by awarding backpay to employees hired into the respiratory department after the unlawful hours reduction took effect. We disagree.

In the 2011 Order, the Board found the "standard remedial action required in cases of this kind applies to individuals employed in the affected unit until Respondent rescinds its unlawful change and bargains with the Union about any future changes." *Cmty. Health Servs.*, 356 N.L.R.B. No. 103, at *14. Because the Hospital still had not rescinded the unlawful hours reduction, the "reimbursement remedy continue[d] to apply to each subsequently-hired employee." *Id.*

The Hospital argues this case is akin to *NLRB v. Dodson's Market, Inc.*, 553 F.2d 617 (9th Cir. 1977), and *Chauffeurs Local Union No. 171 v. NLRB*, 425 F.2d 157 (4th Cir. 1970), in which the courts rejected backpay for subsequently hired employees. But those cases are distinguishable. In *Dodson's Market*, the employer improperly reduced the work hours of two employees in retaliation for their decision to sign union representation cards. 553 F.2d at 618. The Ninth Circuit found the Board erred in awarding backpay to a third employee, who was hired for part-time work ten months after the retaliatory action, because there was no evidence the employer offered the new employee part-time employment instead of full-time employment for reasons relating to the prior unlawful act. *Id.* at 619–20. Similarly, in *Local Union No. 171*, a successor company repudiated the collective bargaining agreement the preceding company had in place with its employees. 425 F.2d at 158. The Board found that conduct improper because

employees were entitled to "some protection . . . from a sudden change in the employment relationship." *Id.* at 159. Accordingly, the Fourth Circuit affirmed the denial of backpay to employees hired after the takeover because they had not experienced any "sudden change in the employment relationship." *Id.*

By contrast, the Hospital's "permanent, department-wide reduction in the hours of work each week" limited the work (and pay) of those hired into the department after the reduction took effect. *Cmty. Health Servs.*, 356 N.L.R.B. No. 103, at *15. In that regard, this case more closely resembles *88 Transit Lines*. There, the employer improperly reduced the number of transit runs available to employees in a certain department. 55 F.3d at 825. Because the employees hired into that department after the unlawful schedule change "suffered the same disadvantage of not being able to bid on [the transit runs] as did the other unit employees," *88 Transit Lines*, 314 N.L.R.B. at 325, the Third Circuit approved the Board's award of backpay to those subsequently hired employees. 55 F.3d at 826. That logic applies here: because the Hospital's hours reduction denied newly hired employees a full work schedule, those employees suffered a "loss of earnings . . . as a result of [the Hospital's] unlawful actions," and deserve backpay under the 2004 Order. *Cmty. Health Servs.*, 342 N.L.R.B. at 404.

C

During the administrative hearing, the Hospital submitted an offer of proof claiming it had attempted to negotiate with the Union about the unlawful hours reduction, but the Union had failed to respond. The Hospital argued its backpay liability should be tolled as of August 28, 2007, the date on which it had "complied with its duty to bargain with the

Union" through its unreciprocated attempts to negotiate. Hospital's Br. 28. The Board held the Union only had an obligation to negotiate if the Hospital had "restored the status quo ante." *Cmty. Health Servs.*, 356 N.L.R.B. No. 103, at *5. The Board thus found that, because the Hospital had not rescinded its unlawful action before it attempted to negotiate, the Union had no duty to bargain. *Id.* The Hospital now takes issue with the Board's ruling, but we find the Board's reasoning to be sound.

Employers must rescind their unlawful actions before attempting bargaining so they cannot "tak[e] advantage of [their] wrongdoing to the detriment of the employees." *U.S. Marine Corp. v. NLRB*, 944 F.2d 1305, 1322 (7th Cir. 1991). Employers cannot force unions to come to the bargaining table in a position of weakness. That is why, "in cases involving unlawful unilateral changes, the Board's normal remedy is to order restoration of the status quo ante as a means to ensure meaningful bargaining," a policy that "has been approved by the Supreme Court." *Porta-King Bldg. Sys.*, 310 N.L.R.B. 539, 539 (1993) (citing *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 216 (1964)), *enforced*, 14 F.3d 1258 (8th Cir. 1994). Accordingly, an employer's attempt to negotiate without first rescinding the unlawful action "does not toll . . . backpay liability." *Porta-King Bldg. Sys.*, 310 N.L.R.B. at 540.

The Hospital asserts its situation is different because the Union "has decided to eschew the entire collective bargaining process," and "backpay [should] not continue to run into eternity." Hospital's Reply Br. 9–10. The Hospital has not provided any evidence the Union has abandoned collective bargaining. And even if the Union has done so, the Hospital can simply rescind the hours reduction, and when its subsequent attempts to negotiate with the Union fail, it can

toll its backpay obligation by showing the bargaining process has reached a "lawful impasse." *NLRB v. Cauthorne*, 691 F.2d 1023, 1026 (D.C. Cir. 1982).

Finally, the Hospital cannot claim its backpay obligation has been tolled because the Union has waived its right to negotiate. The Board found such a waiver in *American Diamond Tool, Inc.*, 306 N.L.R.B. 570 (1992), but there, the union had met with the employer shortly after the layoffs in question, had not requested bargaining about that issue, and had "expressly signaled its willingness to permit such conduct in the future" by proposing a process for laying off additional employees. *Id.* at 570–71. The Union's conduct here does not approach that level of acquiescence.

## II

Because the Board did not adequately explain its refusal to consider interim earnings when calculating the backpay award, we grant the Hospital's petition in relation to that issue, grant the Board's cross-application for enforcement in all other respects, and remand for further consideration of the interim earnings question.

*So ordered*.