GORSUCH, Circuit Judge,
dissenting.
The NLRB’s order effectively seeks to adopt a new rule governing the calculation of backpay in cases where a collective bargaining employer unlawfully reduces the hours of unionized employees. There can, of course, be no doubt that Congress has invested the Board with considerable power to shape labor relations in this country and to provide remedies like backpay in response to employer misconduct. But in our legal order federal'agencies must take care to respect the boundaries of their congressional charters. They may not treat similarly situated classes of persons differently without a rational explanation. And they may not depart from their own existing rules and precedents without a persuasive explanation. See, e.g., Motor Vehicle Mfrs. Ass’n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Respectfully, I believe the NLRB’s new rule fails to abide each of these settled legal principles and, in that way, seeks to make new law unlawfully.
Since 1935 Congress has tasked the Board with the job of “eliminating] the causes of certain substantial obstructions to the free flow of commerce” by promoting collective bargaining. 29 U.S.C. § 151. In aid of that expansive charge, Congress has endowed the Board with considerable remedial authority. If and when it should find that an employer subject to its jurisdiction has engaged in an unlawful labor practice, the Board may issue an order “requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without backpay, as will effectuate the policies” of the Act. 29 U.S.C. § 160(c).
Over the last eighty years, the Board has developed a finely reticulated set of rules aimed at implementing these statutory directives. Of special relevance in this case about backpay, the Board has held that when an employer unlawfully fires an employee or reduces her hours the employer must pay all the wages the employee lost as a result. N.L.R.B. Casehan-dling Manual, pt. 3, § 10536.1. At the same time, this general rule sometimes yields to more specific ones in order to avoid over- or under-compensating the employee. So, for example, after an unlawful labor action an employee may find a new job or increase her hours at a pre-existing second job and in that way replace some or all of her lost wages. Allowing the em *781 ployee in these circumstances to keep both her “interim earnings” and a full backpay award would mean she’d be paid twice for the same hours, leaving her better off than she would have been but-for the employer’s misconduct. To avoid this sort of “windfall” the Board has, from its first order and still to this day, generally deducted interim earnings from its backpay awards. In re Pa. Greyhound Lines, Inc., 1 N.L.R.B. 1 (1935); N.L.R.B. Casehan-dling Manual, pt. 3, § 10554. Indeed, if the employer can prove the employee could’ve found a second job after being unlawfully fired but unreasonably refused the work, the employee’s intentionally forgone interim earnings may also be deducted from a backpay award. N.L.R.B. Case-handling Manual, pt. 3, § 10558.1. At the same time, though, if the employee incurs costs in finding or retaining a second job thanks to the employer’s misconduct, those costs are fully compensable. Id. § 10555. And if in the second job the employee takes on “extra work” — working hours beyond those she would otherwise have spent with the wrongdoing employer — compensation for that extra work remains hers and isn’t used to offset any backpay award. Id. § 10554.3. All of these additions and subtractions share the common aim of ensuring that a backpay award restores the employee to the same position she would’ve enjoyed but-for the employer’s misconduct, without a windfall accruing to either employer or employee.
Now eighty years on, the Board seeks to carve out a class of cases from its tested and pretty ancient backpay procedures. When the employer unlawfully reduces the employee’s hours to zero (termination cases), the Board says it will continue to employ its traditional backpay rules. But when the employer unlawfully reduces the employee’s hours to anything short of zero (hours-reduction cases), the Board now says it will never, under any circumstances, deduct interim earnings from a backpay award. Thus treating cases that seem to differ mostly in degree as different in kind.
The hospital-employer in our case first challenged the Board’s new carve-out rule for hours-reduction cases in the D.C. Circuit. There the Board tried to suggest that its new rule wasn’t really anything new at all but compelled by an existing administrative decision, Ogle Protection Service, Inc., 183 N.L.R.B. 682 (1970). The D.C. Circuit quickly exposed this claim as mistaken. Yes, the D.C. Circuit acknowledged, the Board in Ogle ordered backpay and authorized no deductions for interim earnings. But, the court observed, Ogle wasn’t an hours-reduction case and the employees there had no interim earnings that could have been deducted from their backpay awards. Accordingly, the D.C. Circuit observed, Ogle just “does not address” hours-reduction cases where (as here) the employer does proffer evidence of interim employee earnings that might be deducted. Deming Hosp. Corp. v. NLRB, 665 F.3d 196, 200 (D.C.Cir.2011). In fact, the D.C. Circuit noted, in many past hours-reduction cases the Board has ordered the deduction of proven interim earnings. See id. at 201 (citing examples). And the Board’s own casehandling manual states that interim earnings deductions are generally appropriate with only a few exceptions — and hours-reduction cases are nowhere among those exceptions. See N.L.R.B. Casehandling Manual, pt. 3, § 10554.
Forced to acknowledge that its carve-out rule represents a departure from preexisting practice, the Board offered an alternative rationale in its defense. Now the Board argued that, in response to unlawful reductions in their hours, employees should not face a duty to seek out secondary employment — to mitigate their loss *782 es — like employees in termination cases do. For its part the D.C. Circuit noted that employees in termination cases have a duty to mitigate their losses in the sense that, if they refuse to take new work, they will have their backpay award reduced by the amount of intentionally forgone income they could’ve earned. And for purposes of the appeal, the D.C. Circuit and hospital-employer accepted that there’s a sound reason to avoid imposing a parallel duty to mitigate on employees in hours-reduction cases — because in hours-reduction cases employees seeking secondary work will have to work around the demands of their still-existing primary employer and may not be able to secure a replacement job or as many hours in a replacement job as the employee might wish. At the same time, the court noted, this consideration speaks only to a need to waive any duty to seek secondary employment in hours-reduction cases — to eschew backpay deductions when employees don’t have interim earnings. It does not provide a rational basis for distinguishing between termination and hours-reduction cases when employees are able to and do choose to find other work— when employers do have interim earnings during the backpay period. Given all this, the D.C. Circuit held that the Board’s “explanation for its refusal to consider interim earnings is inadequate” and remanded the matter for reconsideration. Deming Hosp. Corp., 665 F.3d at 201.
Now the Board has tried again, and the hospital-employer has petitioned for review again — this time to our court. In an apparent abundance of caution the Board has offered five new rationales to replace the two the. D.C. Circuit found wanting. But though the Board’s rationales may now be more prolific, I do not find them more persuasive for it.
1. “Promoting Production and Employment.” First and primarily the Board argues that its new policy of refusing to deduct interim earnings in hours-reduction cases will allow employees who take on second jobs to keep both their interim earnings and backpay for the same hours they would have worked for their primary employer. Of course this means a whole class of employees (those in hours-reduction cases who seek and win second jobs) won’t be restored to the same position they would’ve been in but-for the employer’s misconduct, but will be made better off instead. The Board accepts that its new rule creates an employee “windfall” in just this way and seemingly at odds with its prior practice. Yet it defends this consequence not as a bug in the design of its new rule but as its whole point. Promising employees double payment for the same hours, the Board says, will offer them a “greater incentive to voluntarily seek interim employment” and in this way advance the policy of “promoting production and employment.” Cmty. Health Sens., Inc., 361 N.L.R.B. No.25, 2014 WL 4202633, at *7; see Maj. Op. at 776-77.
It seems to me that this line of argument fundamentally misconceives the Board’s remedial charter. The Board’s statutory charge isn’t to promote full employment. See 29 U.S.C. § 151. It’s not some sort of reincarnation of the Works Progress Administration. Instead, Congress invested the Board with the more prosaic — if still vital — job of providing “backpay” arising from “unfair labor practices.” 29 U.S.C. § 160(c). And the Supreme Court has held that this statutory charter means exactly what it says — allowing the Board to restore the “actual losses” employees suffer — no more or less. Phelps Dodge v. NLRB, 313 U.S. 177, 197-98, 61 S.Ct. 845, 85 L.Ed. 1271 (1941). Yet, rather than seeking to restore the earnings employees would have enjoyed but-for the employer’s misconduct, the Board’s new rule candidly seeks to pursue *783 a quite different and entirely extra-statutory objective — the promotion of “production and employment” — and to achieve that end it abandons any pretense of seeking to fulfill its duty of ensuring compensation for actual losses. The Supreme Court long ago rejected Board efforts to use its remedial backpay authority to pursue policy ends other than those specified by the NLRA. Back in the 1940s, and in words equally fitting here, the Court held that while the Board may freely pursue “remedial objectives which the Act sets forth,” it is not licensed to pursue “a distinct and broader policy with respect to unemployment.” Republic Steel Corp. v. NLRB, 311 U.S. 7, 12-13, 61 S.Ct. 77, 85 L.Ed. 6 (1940); see also Phelps Dodge, 313 U.S. at 197-98, 61 S.Ct. 845 (holding that the NLRA limits the Board’s backpay authority to restoring “actual losses”). I do not see how we might come to a different conclusion today.
In saying this much, I hardly mean to suggest the Board lacks leeway in carrying out its remedial charge. Any attempt to recreate a lost but-for world and calculate losses due to a defendant’s misconduct always requires a degree of estimation. As well, the Board must balance its two statutory remedial duties — providing backpay for actual losses and promoting reinstatement — and those two duties can'sometimes conflict in interesting and difficult ways. See, e.g., NLRB v. Seven-Up Bottling Co. of Miami, 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377 (1953). Finally, the Supreme Court has observed that, when a backpay award does aim to restore “actual losses,” its virtue may be additionally recommended by its capacity to promote employment because, in that scenario, the consideration of extra-statutory policies like that one “in no way weakens the enforcement of the policies of the Act■ Phelps Dodge, 313 U.S. at 200, 61 S.Ct. 845. But none of these principles suffices to save the Board’s order in this case. After all, no one before us disputes that the Board’s existing and longstanding backpay rules allow it to supply employees with all of their actual losses in hours-reduction cases. The Board itself doesn’t even attempt to suggest its new carve-out rule offers a superior way to calculate actual losses. Instead, the Board seeks to justify its new carve-out backpay rule exclusively on the ground that it will better promote an entirely distinct policy that lies beyond its statutory authority to pursue.
Besides exceeding its congressional charter, the Board’s rationale faces still two more problems. In the first place, a consistent (non-arbitrary) application of its new rule would seem to forbid the deduction of interim earnings for both termination and hours-reduction cases. After all, if double pay for the same hours will encourage you to take on outside work when the hours in your primary job are reduced to something short of zero, it will encourage you to take on outside work in cases when the hours in 'your primary job are reduced t‘o zero too. Nothing about the Board’s rationale is rationally confined to hours-reduction cases. Yet it’s those cases alone the Board today wishes to carve out, without any explanation why. Beyond even that, by enforcing a backpay regime that is markedly more generous in hours-reduction cases than termination eases the Board’s new rule would seem to create a paradoxical incentive for employers to engage in behavior even more inimical to the “promotion of production and employment” — pushing them in marginal eases toward termination and away from hours-reductions in order to reduce their backpay liability. Yet another problem the Board neither ponders nor offers reason for disregarding.
2. “Rewarding Extra Work.” If its primary rationale should fail, the Board ar *784 gues alternatively that its new carve-out rule is justified by the “well established” principle found in § 10554.3 of its casehan-dling manual providing that “[i]n cases where a diseriminatee worked substantially more hours for an interim employer than he or she would have worked for the gross employer, only interim earnings based on the same number of hours as would have been available at the gross employer should be offset against gross backpay.” N.L.R.B. Casehandling Manual, pt. 3, § 10554.3.
By its terms, however, this provision can be fairly described as no better than irrelevant. Section 10554.3 merely provides that an employee gets to keep interim earnings for hours above and beyond those she would have worked at the original employer — promising that the employee can always retain earnings from a true second or “moonlighting” job. And exactly none of this is at issue here. Everyone before us readily accepts that the sort of wages § 10554.3 discusses belong to the employee. The only question presented in this case is what to do about earnings for those hours the employee would have worked for the original employer but-for the unlawful action — and on that question § 10554.3 stands mute. •
Maybe the Board’s citation to § 10554.3 is meant less than literally, as a sort of analogy. Maybe the Board means to suggest that, just as an employee shouldn’t have her backpay hours reduced for hours beyond those she could have worked at her employer, she shouldn’t ever have her hours reduced for taking on a second job when she didn’t have to. But if that’s the analogy that’s intended, it’s one that fails. It fails because the point of § 10554.3 is to ensure that the employee is made whole for her actual losses by guaranteeing that her backpay award isn’t reduced by earnings she would have enjoyed whether or not her primary employer engaged in an unfair labor practice. Section § 10554.3 removes from the backpay analysis interim earnings without a causal connection to the employer’s misconduct. The rale is, in this way, all about helping create an accurate picture of what the world would’ve looked like but-for the employer’s misconduct — and in that way all about helping fulfill the Board’s statutory remedial charge. Meanwhile, the Board’s new carve-out rule has again (and admittedly) nothing to do with its statutory charter. The Board doesn’t attempt to defend its new rule on the ground that it helps create a more accurate picture of an employee’s actual losses. Or that it has anything to do with that purpose at all. Instead, it argues the rule aims to reward “extra work” in the very particular (and very different) sense that, thanks to the wind-, fall it offers employees, it encourages them to take on second jobs and, in that way, promotes “production and employment.” So it is the Board’s second, “extra work” rationale at best folds right back into its first and returns us to all the problems we’ve already encountered.
3. “Accounting for Additional Hardships.” Here the Board points to the fact that, unlike employees in termination cases, employees who face reductions in their hours and proceed to seek a second job must “adjust any outside employment hours to accommodate [the primary] employer’s demands.” So, for example, they have to “resolv[e] scheduling conflicts between the two jobs and- traveling to a second workplace.” By refusing t.o deduct interim earnings, the Board seems to imply, its new rale will ensure that the particular costs borne by employees in hours-reduction cases are fully compensated.
The problem is the Board’s existing rules already do this. Under its existing remedial regime, the Board is indubitably *785 free to compensate an employee for any costs incurred in taking on or holding a second job thanks to the employer’s unlawful actions — including costs associated with resolving scheduling conflicts or traveling between workplaces. N.L.R.B. Casehan-dling Manual, pt. 3, § 10555. Indeed, the Board’s order identifies no class of costs its existing remedial rules fail to capture. And before departing from its existing rules the Board must offer some reason for doing so, some reason why its new rule might be rationally preferred to its existing authorities. It doesn’t even try.
Perhaps the Board might respond by suggesting that some costs employees suffer are intangible and incalculable — and that its new carve-out rule does a better job of compensating for such costs. But it’s far from clear the Board means to pursue such an argument. After all, the Board itself cites by way of support the entirely tangible and calculable costs associated with “traveling to a second workplace.” And even if it were fair to read the Board as making a sort of “intangible cost” argument, it would still face its problems. For the Board nowhere explains how its statutory charge to order backpay entails with it the authority to afford tort-like remedies for psychic and other losses not associated with lost wages. And even on its own terms the Board’s argument proves too much. While employees in hours-reduction cases may face unique costs in traveling between and juggling two jobs, it’s surely not the case that they alone suffer intangible hardships: you might even expect the intangible human costs associated with wrongful terminations to be worse than those associated with wrongful hours-reduetions. Yet the Board’s new rule seeks to distinguish between the two types of cases when it comes to intangible hardships — and does so without offering an explanation why the one situation should receive solicitude the other does not.
4. “Preventing Dilatory Conduct.” Here the Board points out that the duty to provide backpay sometimes can have unintended consequences on “the companion remedial requirement” of reinstatement— by giving employers ah incentive to prolong their unlawful labor practices while an employee’s interim earnings grow and the employer’s corresponding backpay obligation diminishes. The Board suggests its new carve-out rule will help curb this incentive.
I don’t see how. No one doubts that the Board must create remedial rules that balance between the statutorily authorized remedies of backpay and reinstatement. No one doubts either that pursuing one remedy without an eye on the other can create strange incentives like the one the Board has identified. But many decades ago the Board identified and devised a solution to the very problem it points to today. Before In re F.W. Woolworth Co., 90 N.L.R.B. 289 (1950), the Board’s blanket deduction of interim earnings almost perfectly achieved the policy of making employees whole when it came to back-pay — they received no more and no less than they would have received at their original job. But employers would sometimes delay reinstatement to reduce their backpay obligations, a result inimical to the Board’s second statutorily prescribed remedial objective and preventing “a restoration of the situation, as nearly as possible, to that which would have obtained but for the illegal discrimination.” Id. at 292. The Board’s solution, approved by the Supreme Court in Sevenr-Up, was a quarterly deduction formula that, while sometimes resulting in a less-than-perfect award of backpay, effectively eliminated the employer’s incentive to drag out reinstatement and thus achieved a reasonable balance *786 between the Board’s two remedial charges. 344 U.S. at 345-48, 73 S.Ct. 287. In our case, the Board acknowledges that it faces the same problem it solved in Woolworth. And it doesn’t disparage the Woolworth solution or even question that it adequately eliminates the unwanted employer incentive. In fact, it continues to apply the Woolworth solution to termination cases. And (again) I just don’t see how the agency might be permitted to depart from a well-established policy or eschew an obvious alternative without offering some reasoned explanation consistent with its statutory charter.
5. “Allocating Windfalls.” Finally, the Board contends that, if it deducts interim earnings, employers will receive a windfall. But if it refuses to deduct interim earnings, employees will receive a windfall. One side or the other will inevitably come out better than they would have but-for the unlawful labor practice, the Board says, so it should have the discretion to allocate the windfall as it wishes. And because the employee seeking additional work is promoting production and employment through her extra effort (back once more to that doubtful rationale), that’s tiebreaker enough.
This is perhaps the Board’s most curious argument yet. Over eight decades the Board has taken pains to develop a set of rules that prevents windfalls for either side. To prevent employee windfalls, the Board has long deducted interim earnings. And to prevent employer windfalls, the Board’s existing rules and precedents afford it the power to order the employer to (1) pay backpay, without deduction if an employee chooses not to find a second job in hours-reduction cases, (2) pay any and all costs an employee incurs if she does take oh a second job,' and (3) ensure any backpay deductions • for interim earnings are limited to the hours the employee would’ve worked for the wrongdoing employer. In this light, it’s hard to see what windfall might fall into the employer’s lap — or how, should the problem arise, the Board could not lawfully get at it. For again, the Board’s existing remedial precedents and rules permit it to order compensation for all actual losses. Strangely, .the Board ignores all this — all the careful handiwork of generations of Board members aimed at securing a tailored remedy approximating actual losses — nowhere explaining why those efforts fail only now and only in the context of hours-reduction cases.
In the end, it’s difficult to come away from this case without wondering if the Board’s actions stem from a frustration with the current statutory limits on its remedial powers — a frustration that it cannot pursue more tantalizing goals like punishing employers for unlawful actions or maximizing employment; that it is limited instead to the more workmanlike task of ensuring employees win backpay awards that approximate the actual losses they’ve suffered. A frustration that seems to parallel the frustration the Board experienced when it sought in Republic Steel and Phelps Dodge to issue similarly expansive extra-statutory remedies. But then as now frustration should not beget license. In our legal order the proper avenue for addressing any dissatisfaction with congressional limits on agency authority lies in new legislation, not administrative ipse dixit. I respectfully dissent.