McHUGH, Circuit Judge.
I. INTRODUCTION
This challenge to the National Labor Relations Board’s (the Board) petition for enforcement questions whether the Board may disregard interim earnings when calculating backpay awards for employees whose labor injury falls short of unlawful termination. Respondent Mimbres Memorial Hospital and Nursing Home (the Hospital) argues the Board failed to provide adequate support for its decision to disregard interim earnings and therefore requests that we reverse the Board’s back-pay calculation. We defer to the Board’s policy-based rationale in support of its remedial decision and affirm and enforce its order.
II. BACKGROUND

A. The Unfair Labor Practice Allegations and Proceedings

The complicated procedural history of this case stems from the Hospital’s 1999 decision to reduce the hours of its full-time, respiratory-department employees. Cmty. Health Servs., Inc., 342 N.L.R.B. 398, 400-02 (2004). As a result of this reduction in hours, the United Steelworkers of America, District 12, Subdistrict 2, AFL-CIO, a union representing respiratory-department employees under an exclusive collective bargaining agreement, filed charges against the Hospital on- behalf of the impacted employees. Based on these allegations, the Board’s General Counsel filed a complaint with the Board, asserting the Hospital had violated § 8(a)(1), (5) of the National Labor Relations Act (the Act or NLRA), 29 U.S.C. § 158. The Board ultimately agreed and ordered the Hospital to “make whole any employee for any loss of earnings and other benefits suffered as a result of its unlawful actions.” Cmty. Health Servs., Inc., 342 N.L.R.B. at 404. On petition for review in this court, we enforced the Board’s order in whole. NLRB v. Cmty. Health Servs., Inc., 483 F.3d 683 (10th Cir.2007).

B. The Compliance Proceedings

The case proceeded to the compliance phase, where an administrative law judge (ALJ) determined the Hospital owed thirteen current and former employees approximately $105,000 in backpay. Cmty. Health Servs., Inc., No. 28-CA-16762, 2010 WL 3285384 (N.L.R.B. Div. of Judges July 28, 2010). In arriving at this amount, the ALJ rejected the Hospital’s argument that any income an employee had earned from secondary employment during the backpay period — i.e., interim earnings— should be deducted from that employee’s backpay calculation. Id.
*771 In reaching that conclusion, the ALJ applied a backpay formula the Board first pronounced in Ogle Protection Service, Inc., 183 N.L.R.B. 682 (1970). In Ogle, the Board determined that interim earnings should not be deducted from backpay awards when the underlying violation is something other than wrongful termination of employment. 138 N.L.R.B. at 683. The Board in Ogle apparently presumed that employees who remain employed by the wrongdoing employer will not make interim earnings. Id. Here, the ALJ determined that application of the Ogle formula was appropriate because to hold otherwise “would have the effect of imposing a duty on employee victims of an unfair labor practice to moonlight in order to minimize the impact of the unlawful conduct for the benefit of the wrongdoer.” Cmty. Health Servs., 2010 WL 3285384.
The Hospital filed exceptions and supporting briefs to the Board, challenging the ALJ’s decision. But in its Compliance Order, the Board affirmed the ALJ’s rulings, findings, and conclusions. Cmty. Health Servs., Inc., 356 N.L.R.B. No. 103, 2011 WL 702298, at *18 (Feb. 28, 2011).
The Hospital next petitioned the United States Court of Appeals for the District of Columbia[1] for review of the Board’s Compliance Order. Deming. Hosp. Corp. v. NLRB, 665 F.3d 196 (D.C.Cir.2011). The D.C. Circuit rejected the Board’s interpretation of Ogle and the Board’s concern that deducting interim earnings would impose a duty to moonlight on the victims of wrongful hour reductions. Id. at 200. The circuit court further explained that the Compliance Order conflated two distinct concepts: an employee’s duty to mitigate (which is nonexistent when there is no cessation of employment) and the “rules governing when backpay should be reduced by interim earnings.” Id.
The D.C. Circuit also noted that, since Ogle, the Board had been inconsistent in its approach to calculating backpay in the absence of a cessation of employment. Id. at 201. In light of this unclear precedent, the court ruled the Board had not adequately explained its rationale for refusing to consider interim earnings here. It therefore remanded the Compliance Order “for a more thorough analysis of the issue.” Id.
On remand, the Board issued a Supplemental Order reaffirming its original ruling. Cmty. Health Servs., Inc., 361 N.L.R.B. No. 25, slip op. (Aug. 25, 2014). The Board identified the sole issue on remand as “whether the Board should deduct an employee’s interim earnings from other employment when calculating back-pay in cases where the employee suffers no cessation of employment with the wrongdoing respondent-employer and has no duty to mitigate by seeking interim employment” and concluded that “the deduction of interim earnings in this situation would not best effectuate statutory policy.” Id. at *1. In reaffirming its prior conclusion, the Board provided five new policy justifications for its choice of remedy. Specifically, the Board explained that declining to deduct interim earnings where there is no cessation of employment (1) encourages employment and production, (2) is more consistent with the Board’s policy of not deducting interim earnings obtained from work performed above and beyond an employee’s duty to mitigate, (3) *772 better accounts for the hardships that arise when taking on secondary employment, (4) discourages employers from engaging in dilatory conduct such as delaying compliance with an order to rescind unfair labor practices, and (5) prevents a windfall to the wrongdoing employer. Id. at *7-*9. Although the Board acknowledged the existence of some inconsistent precedent on this issue, it argued that the cases in which it “inadvertently” deducted interim earnings from backpay calculations “represent a tiny fraction of the hundreds of cases” in which the Board declined to deduct the interim earnings of employees whose injuries fall short of unlawful termination. Id. at *7. Based on these considerations, the Board reaffirmed its prior backpay order, concluding that “important statutory policies strongly support a practice of declining to deduct interim earnings when applying the Ogle Protection Service backpay formula for cases involving economic loss but no cessation of employment.” Id. at *9.
Next, General Counsel filed an application in this court for enforcement of the Board’s decision, and the Hospital responded in opposition. We exercise jurisdiction under 29 U.S.C. § 160(e), (f).
III. DISCUSSION
On this petition for enforcement, we are asked to determine whether the Board provided sufficient support for its decision to exclude interim earnings from backpay calculations when the employer has wrongfully reduced employee hours, but not terminated employment. The Hospital contends the Board’s Supplemental Order is inadequate, arguing the Board’s reliance on- Ogle Protection Service, Inc., 183 N.L.R.B. 682 (1970), is flawed and its policy justifications are unfounded. General Counsel contends the Board selected a reasonable remedy that is in line with the policies underlying the NLRA.
The Board’s power to award back-pay arises under § 10(c) of the NLRA, which permits the Board to “take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of [the Act].” 29 U.S.C. § 160(c). Because a backpay' award is “only an approximation,” the Board “has considerable discretion in selecting a method reasonably designed to approximate the amount of pay” due to a wronged employee. NLRB v. Velocity Express, Inc., 434 F.3d 1198, 1202 (10th Cir.2006) (internal quotation marks omitted). On review of a backpay order, our task is narrow. See id. (“The NLRB’s power to order backpay is a broad, discretionary one, ‘subject to limited judicial review.’ ” (quoting Fibreboard Corp. v. N.L.R.B., 379 U.S. 203, 216, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964))). We will not disturb the Board’s remedial decision unless it is “arbitrary or unreasonable,” or, in other words, “is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the NLRA.” Id. (brackets and internal quotation marks omitted).
It is through this deferential lens that we assess the Hospital’s opposition to the Board’s Supplemental Order. We first review the Board’s interpretation of Ogle and its progeny, and we then turn to the Hospital’s criticism of the Board’s policy justifications.

A. The Supplemental Order Properly Interpreted Ogle

To properly assess the Board’s application of its decision in Ogle, we begin by explaining the Board’s historical approach to two underlying concepts: the duty to mitigate and the calculation of backpay awards.
*773 1. Board Precedent Regarding the Duty to Mitigate and Backpay Calculations
First, we consider the duty to mitigate. Under longstanding Board and Supreme Court precedent, employees who believe they have been unlawfully terminated have a duty to seek out substitute employment while they await a Board decision on that issue. Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 199-200, 61 S.Ct. 845, 85 L.Ed. 1271 (1941) (recognizing the Board’s power to “give appropriate weight to a clearly unjustifiable refusal to take desirable new employment” when calculating backpay). Although the Board and courts frequently refer to this obligation as a duty to mitigate, the term is somewhat of a misnomer because the motivation for the obligation is more “the healthy policy of promoting production and employment” than “the minimization of damages.” Id.
Where unlawfully terminated employees are under an obligation to seek work, the policy holds that backpay calculations logically should include a deduction for interim earnings. Without such a deduction, employees who are willing to bet on the outcome of the claims against the former employer or whose short-term financial needs are minimal would have little incentive to comply with their mitigation obligation. Instead, they could wait for a favorable decision from the Board to make them whole. The duty to seek interim employment gives these employees an incentive to remain productive during the period the claims against the former employer are unresolved.
Conversely, employees who are not unlawfully terminated but suffer other labor injuries — e.g., reduction in hours or wage — have no duty to seek secondary employment pending a decision on their unfair labor practices claim. See 88 Transit Lines, Inc., 314 N.L.R.B. 324, 325 (1994) (explaining that employees who are not discharged are not required “as part of any mitigation obligation, to obtain additional replacement work from some other employer during the backpay period”). But some employees who are unable to wait for the outcome of an NLRB action will make up the lost hours with supplemental work despite the lack of any- legal duty to do so. The fact that employees who have no duty to seek secondary employment may nevertheless do so raises the question of whether the Board should account for such interim earnings when calculating a backpay award.
The Board’s two seminal backpay decisions — F.W. Woolworth, Co., 90 N.L.R.B. 289 (1950), and Ogle Protection Service, Inc., 183 N.L.R.B. 682 (1970) — do not squarely address this issue. In Woolworth, the Board sought a method of curtailing employers’ incentive to delay reinstating wrongfully terminated employees.[2] Because the wrongfully terminated employee has a duty to seek interim employment, the longer the employer waited to reinstate the injured employee, “the greater would be the reduction in back-pay liability,” and the greater the likelihood the employee would find higher paying employment and reject an offer of reinstatement. Woolworth, 90 N.L.R.B. at 292. Woolworth remedied this problem by *774 instituting a quarterly backpay formula, through which the Board subtracts the employees’ interim earnings in each quarter from what the employees would have earned from the wrongdoing employer during that same quarter, had they not been terminated. Id. at 292-93. Under this formula, interim earnings made in pri- or quarters have no impact on the backpay calculation for subsequent quarters, and vice versa. For example, if an employee suffered lost pay before securing interim employment, the employer could not avoid paying that amount based on the employee’s success in finding a higher paying job in a subsequent quarter.
Ogle, on the other hand, involved employees who had not been unlawfully terminated, and thus had no duty to mitigate, but who were otherwise injured when their employer repudiated the terms of a collective bargaining agreement. 183 N.L.R.B. at 683. In Ogle, the Board concluded that Woolworth’s “quarterly computation is unnecessary and unwarranted” in cases that do not “involve cessation of employment status or interim earnings that would in the course of time reduce backpay.” Id. The Board therefore held that the Woolworth formula is not applicable where there is no cessation of employment, apparently failing to anticipate that employees who are not terminated may nonetheless be motivated to seek secondary employment if, for example, the employer’s unfair labor practices result in reduced wages or hours. As a result, the Board did not clearly address in Ogle whether backpay awards should be reduced by interim earnings in cases where there is no cessation of employment and therefore no duty to mitigate.[3]
2. The Board’s Assessment of Ogle in the Supplemental Order
With this backdrop in mind, we turn to the Board’s discussion of Ogle in its Supplemental Order. The Board acknowledged that “the literal language of Ogle Protection Service does not compel the conclusion that interim earnings, where proven, should not be deducted in eases where there is no job loss.” Cmty. Health Servs., Inc., 361 N.L.R.B. No. 25, 2014 WL 4202633, at *7 (Aug. 25, 2014). The Board also recognized that in at least six of its prior decisions, it allowed for the deduction of interim earnings where there was no cessation of employment. Id. at *6 (citing to Atlantis Health Care Group (P.R.) Inc., 356 N.L.R.B. No. 26, 2010 WL 4859824, at *1 (Nov. 15, 2010); Willamette Industries, 341 N.L.RiB. 560, 564-565 (2004); Quality House of Graphics, 336 N.L.R.B. 497, 516-517 (2001); Ironton Publications, 313 N.L.R.B. 1208, 1208 n. 4 (1994); Consumers Asphalt Co., 295 N.L.R.B. 749, 752 (1989); and Ford Bros., 284 N.L.R.B. 211, 211-12 (1987)). But the Board indicated *775 that any reference to the deduction of interim earnings in these cases was “inadvertently mistaken, rather than intentional” and that they “represent a tiny fraction of the hundreds in which Ogle Protection Service has been correctly cited and applied.” Id. at *7. Notwithstanding these case's to the contrary, the Board expressed that its general policy “has been to preclude the deduction of interim earnings from other jobs when applying Ogle Protection Service to remedy employees’ monetary losses where there is no cessation of employment and attendant duty to mitigate damages.” Id.
The Hospital takes issue with the Board’s analysis of Ogle and its progeny, contending the Board was merely speculating when it described the decisions in which it deducted interim earnings, despite no cessation of employment, as “inadvertently mistaken.” Instead, the Hospital argues these decisions demonstrate that, until now, the Board has never expressly declined to deduct interim earnings in cases that do not involve a cessation of employment, and at best, the Board has been inconsistent in its approach to back-pay calculations in such cases.
We agree with the Hospital that the Board’s precedent has been unclear. But in its Supplemental Order, the Board acknowledges this inconsistency and the need to adopt a consistent approach for future cases.[4] Thus, while the Board did not sufficiently address its inconsistent precedent in the original Compliance Order, we are satisfied that in its Supplemental Order, the Board adequately acknowledged its anomalous decisions and correctly characterized Ogle and its progeny. We therefore reject the Hospital’s invitation to overturn the Supplemental Order based on the Board’s Ogle analysis.

B. The Board’s Policy Justifícations Were Reasonable

We turn next to the Board’s policy justifications for concluding that interim earnings should not be deducted from backpay awards when there has been no cessation of employment.[5] Because of the *776 deference we owe to the Board’s remedial decision, our limited role is to determine whether the Board’s policy justifications represent “a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the NLRA.” NLRB v. Velocity Express, Inc., 434 F.3d 1198, 1202 (10th Cir.2006) (brackets and internal quotation marks omitted). These policies include “the promotion of industrial peace, the prevention of unfair labor practices and protection for victimized employees.” Dayton Tire & Rubber Co. v. NLRB, 591 F.2d 566, 570 (10th Cir.1979); see also Nathanson v. NLRB, 344 U.S. 25, 27, 73 S.Ct. 80, 97 L.Ed. 23 (1952) (“A back pay order is a reparation order designed to vindicate the public policy of the statute by making the employees whole for losses suffered on account of an unfair labor practice.”); 29 U.S.C. § 151 (declaring the policies of the NLRA). In its Supplemental Order, the Board described five policy reasons for its decision. We address each rationale in turn to determine whether it fairly aligns with the policies of the NLRA.
1. Encouraging Production and Employment
First, the Board reasoned that deducting interim earnings from backpay calculations in this context would discourage production and employment by making employees who seek additional work no better off than their counterparts who remain underemployed. Cmty. Health Servs., Inc., 361 N.L.R.B. No. 25, at *7. As the Board noted, “by declining to deduct interim earnings absent a cessation of employment, we offer employees a greater incentive to voluntarily seek interim employment, thereby affirmatively promoting production and employment.” Id. (internal quotation marks omitted). In support of its reasoning, the Board turned to Phelps Dodge Corp. v. NLRB, in which the Supreme Court relied on the same underlying policy to justify the imposition of a duty to mitigate and the deduction of interim earnings, including amounts “which the workers ‘failed without excuse to earn,’ ” where there has been an unlawful cessation of employment. 313 U.S. 177, 200, 61 S.Ct. 845, 85 L.Ed. 1271 (1941).
Although it is seemingly counterintuitive to use the rationale underlying the duty to mitigate in cases where no such duty exists, the goal of promoting production and employment is advanced in both instances. In wrongful termination cases, employees know their backpay award will be reduced by imputed interim earnings if they breach their duty to mitigate and are motivated to seek actual employment. Likewise, where the violation does not involve the cessation of employment, employees who have no duty to mitigate will be encouraged to seek supplemental employment if they can retain the benefit of that effort. Although the extent to which productivity is impacted is greater in a termination case, we are not convinced the Board’s reliance on this rationale in a case where there is no cessation of employment constitutes a patent attempt to achieve ends contrary to those that can be said to fairly effectuate the goals of the NLRA. This is so even though promoting production is not one of the NLRA’s express policy objectives because, *777 as the Supreme Court stated in Phelps-Dodge Corp., “[t]his consideration in no way weakens the enforcement of the policies of the Act.” Id.
2. Rewarding “Extra Effort”
Second, the Board posited that declining to deduct interim earnings in this situation is more consistent with its backpay calculations in other contexts. Cmty. Health Servs., Inc., 361 N.L.R.B. No. 25, at *7. Specifically, the Board analogized employees who have a duty to mitigate but go above and beyond that duty with employees who have no mitigation duty but nonetheless obtain additional work. Under established Board policy, employees who perform more work than required are entitled to retain the benefit of such “extra effort.” See N.L.R.B. Casehandling Manual, pt. 3, § 10554.3 (2014), https://www. nlrb.gov/reports-guidance/manuals, (explaining in the context of employees who have a duty to mitigate, “only interim earnings based on the same number of hours as would have been available at the gross employer should be offset against gross backpay”). Through this policy, the Board rewards the employees who do more than is required, rather than the wrongdoing employer. See In re Center Constr. Co., 355 N.L.R.B. 1218, 1221 (2010) (“[I]f a diligent backpay claimant chooses to work additional overtime during interim employment it should operate to his advantage not that of the employer required to make him whole for a discriminatory discharge.”); EDP Med. Comput. Sys., 293 N.L.R.B. 857, 858 (1989) (“A backpay claimant who chooses to do the extra work and earn the added income made available on the interim job may not be penalized by having those extra earnings deducted from the gross backpay owed by the Respondent.” (internal quotation marks omitted)). The Board reasoned it should similarly reward employees who take on additional work in the absence of any obligation to do so by not deducting the interim earnings that result from their extra efforts. Id.
The Hospital challenges this policy justification by advancing a different definition of “extra effort.” In contrast with the Board’s definition, which equates' extra effort with any work employees perform beyond their legal obligation, the Hospital would define extra effort as work employees perform beyond what they would have done for the noncompliant employer. In this case, for example, the Hospital unlawfully reduced its respiratory-department employees’ hours from forty hours to between thirty-six and thirty-two per week. Under the Hospital’s definition, “extra effort” would mean any work employees completed for a secondary employer during the backpay period that exceeded the four to eight hours per week necessary to meet a forty-hour work week.[6]
Although the Board could have adopted either version, we will uphold its definition of extra effort for purposes of fashioning an appropriate remedy unless the choice conflicts with the policies of the NLRA. We see no such conflict here.
3. Accounting for Additional Hardships
Third, the Board justified its decision to ignore interim earnings through its observation that an employee who seeks work from a secondary employer generally suffers additional hardships, “such as resolving scheduling conflicts between the two jobs and traveling to a second workplace.” Cmty. Health Servs., 361 N.L.R.B. No. 25 *778 at *8. By allowing the employee to retain the benefit of undertaking these hardships, the Board’s policy “acknowledge^] these practical considerations and encourage[s] employees to address their financial situations contemporaneously.” Id.
The Board could have conceivably accounted for some of these hardships by requiring the wrongdoing employer to reimburse its employees for the costs associated with working a second job, such as travel expenses. See Crossett Lumber Co., 8 NLRB 440, 497 (1938) (discussing reimbursement for travel expenses in the context of wrongfully terminated employees who found new employment). But not all hardships an employee suffers when juggling two jobs are so tangible. For example, it would be impractical, if not impossible, to ascribe a dollar amount to the difficulties associated with resolving scheduling conflicts or accommodating the demands of two employers. See Cmty. Health Servs., Inc., 361 NLRB No. 25 at *8 (“[T]he employee whose hours or wages have been unlawfully reduced continues to work for the wrongdoing employer and must adjust any outside employment hours to accommodate that employer’s demands.”). Therefore, by declining to deduct interim earnings from backpay awards in this context, the Board’s decision better addresses these intangible hardships.
The Hospital does not disagree that employees who work a second job while remaining employed by the wrongdoing employer may face these added obstacles. But it nonetheless challenges the Board’s reliance on this rationale because General Counsel put forth no evidence of any additional hardships the employees actually suffered in this case, But we are not convinced General Counsel was required to introduce such evidence or that the Board needed to make specific findings on this issue. The Board articulated a general policy that will apply beyond the facts of this case. In doing so, “the Board is not confined to the record of a particular proceeding.” NLRB v. Seven-Up Bottling Co. of Miami 344 U.S. 344, 349, 73 S.Ct. 287, 97 L.Ed. 377 (1953). Rather, the Board may rely on its “[c]umulative experience,” which “begets understanding and insight by which judgments not objectively demonstrable are validated or qualified or invalidated.” Id.
When applying its general remedial policy to the facts of this case, the Board was required to consider any unique circumstances that would make the remedy’s “application to [the] particular situation oppressive and therefore not calculated to effectuate a policy of the Act.” Id. But the Hospital, not General Counsel, had the burden of putting forth evidence demonstrating the existence of unique circumstances. See Velocity Express, 434 F.3d at 1203 (“[Respondent] had the burden of proof on mitigation of its backpay obligation.”); Hansen Bros. Enters., 313 N.L.R.B. 599, 600 (1993) (“[T]he Respondent had the burden of showing why any modifications should be made to the amounts set forth in the backpay specification.”). Although the Hospital contends it was deprived of an opportunity to discover any such evidence, its discovery requests in the NLRB proceedings pertained only to general evidence regarding the affected employees’ interim earnings. The Hospital never requested discovery regarding whether any of those employees who made interim earnin'gs suffered added hardships. Moreover, even if the Hospital had put forward evidence demonstrating the added-hardships rationale does not apply to all of the affected employees here, the other justifications for the Board’s policy decision would remain intact. The Board therefore acted reasonably in fashioning a *779 remedy based on its cumulative experience that employees who take on secondary employment will generally confront added hardships.
4. Preventing Dilatory Conduct
Fourth, the Board explained that the potential for an employer to engage in dilatory conduct similar to that which prompted it to adopt the Woolworth formula is present when an employer unlawfully reduces hours or wages. Cmty. Health Servs., 361 N.L.R.B. No. 25 at *9. •The Board reasoned that deducting interim earnings from a backpay calculation would create an incentive for wrongdoing employers to delay rescinding their unlawful conduct, “knowing that the longer an employee worked a second job, the greater could be the reduction in backpay owed.” Id. The Board explained that declining to deduct interim earnings in this context has the same deterrent effect as the quarterly computation has in the context of an unlawful termination. Id.
The Hospital acknowledges the Board’s remedy would have this deterrent effect, but argues the Board could simply have applied the Woolworth formula in this context to achieve the same result. But so long as the Board provides reasonable support for its selection of remedies and its rationale aligns with the policies of the Act, we will not second guess the Board’s choice. Velocity Express, 434 F.3d at 1202. Thus, although the Board could have adopted the Woolworth formula in noncessation cases and reduced back pay awards by quarter based on interim earnings, it was not required to do so. Where the remedy chosen by the Board does not conflict with the goals of the NLRA, we defer to the Board’s decision.
5. Allocating Windfalls
Finally, the Board considered the benefits conferred on the employer and em-
ployee by the alternative approaches to calculating backpay under the present circumstances. On the one hand, the Board concluded that deducting interim earnings when an employee has no obligation to seek additional work “would represent an unwarranted windfall to the employer and discourage compliance with the law.” Cmty. Health Servs., 361 N.L.R.B. No. 25, at *8. Alternatively, however, if interim earnings are not deducted, the Board acknowledged that the employee may enjoy a windfall by collecting backpay and interim wages that total more than the employee would have earned in the absence of a violation. The Board ultimately concluded that where one of the parties will obtain a windfall, it is more appropriate for it to be the employee whose extra effort resulted in the interim earnings, rather than the recalcitrant employer. See United Aircraft Corp., 204 N.L.R.B. 1068, 1073 (1989) (explaining that the Board is not concerned if an employee is made “more than ‘whole’ ” as a result of “extra effort”). Thus, in selecting between two imperfect remedies, the Board expressed its preference for the one that requires the employer to pay the full amount of backpay, while permitting the employees to retain the benefit of their extra effort. The Board concluded this was preferable to adopting a remedy that would reduce the wrongdoing employer’s liability while treating the industrious employees no better than those who do nothing.
And we cannot agree with the Hospital’s argument that the potential for a windfall to the employee makes the Board’s remedy punitive and therefore impermissible. See Republic Steel Corp. v. NLRB, 311 U.S. 7, 12, 61 S.Ct. 77, 85 L.Ed. 6 (1940) (“[T]he [Board’s] power to command affirmative action is remedial, not punitive.”). Under the Board’s remedy, the Hospital is *780 not required “to do more than make [the employees] whole for the loss of earnings suffered as a result of [their] unlawful [reduction in hours].” United Aircraft Corp., 204 N.L.R.B. at 1073. The interim earnings are unrelated to the loss of earnings caused by the employer’s wrongdoing. Instead, those earnings are the result of the employees’ extra effort in working a second job, despite no obligation to do so. Thus it is the employees, not the employer, who make themselves more than whole. The Board’s remedy does not require the Hospital to pay more than the extent of the injury it caused and does not impose a fine or other penal consequence. It is therefore not impermissibly punitive.
In summary, the Board provided reasonable justifications for declining to deduct interim earnings in cases where there is no cessation of employment. Although other reasonable remedies undoubtedly exist, so long as the Board’s selected remedy is not contrary to the policies of the NLRA, we must defer to its remedial choice.
IV. CONCLUSION
For the reasons explained above, we affirm and enforce the Board’s Supplemental Order.

. Under 29 U.S.C. § 160(f), a party "aggrieved by a final order of the Board” may obtain review of the order "in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United.States Court of Appeals for the District of Columbia.”

. Before the Board decided F.W. Woolworth, Co., 90 N.L.R.B. 289 (1950), it calculated backpay "by subtracting what an employee actually earned during the entire backpay period from what she would have earned during that period had the unlawful action not occurred.” Deming Hosp. Corp. v. NLRB, 665 F.3d 196, 199 (D.C.Cir.2011); see also Pennsylvania Greyhound Lines, Inc., 1 NLRB 1, 51 (1935) (calculating a backpay award by determining what the employee would have earned from the noncompliant employer during the backpay period, "less the amount which each [employee] earned subsequent to discharge”).

. In creating the exception to the Woolworth formula, the Board in Ogle explained that a quarterly computation is unnecessary for "a violation of the Act which does not involve cessation of employment status or interim earnings that would in the course of time reduce backpay.” Ogle Prot. Serv., Inc., 183 N.L.R.B. 682, 683 (1970) (emphasis added). Thus, Ogle could be limited to cases where there is neither a cessation of employment nor interim earnings. Under this reading, when an employee makes interim earnings during the backpay period, the Woolworth formula would apply irrespective of whether there has been a cessation of employment. But the Hospital has not advanced this reading. Instead, the Hospital, the Board, and the D.C. Circuit all agree that Ogle does not clearly address the present issue. And even if it did, the Board is free to reconsider its position with the benefit of specific facts, so long as the new remedy aligns with the NLRA’s underlying policies. NLRB v. Curtin Matheson Scientific, Inc., 494 U.S. 775, 787, 110 S.Ct. 1542, 108 L.Ed.2d 801 (1990) ("[A] Board rule is entitled to deference even if it represents a departure from the Board’s prior policy.”).

. Although inconsistent guidance from the Board could raise fair notice concerns, the Hospital has not made a fair notice argument in the proceedings before the Board, or in its appellate briefing. We therefore lack the power to consider this issue. 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.”); Woelke & Romero Framing, Inc. v. NLRB, 456 U.S. 645, 665, 102 S.Ct. 2071, 72 L.Ed.2d 398 (1982) (concluding that § 160(e) deprives appellate courts of jurisdiction to consider issues "not raised during the proceedings before the Board”); see also Davis v. McCollum, 798 F.3d 1317, 1320 (10th Cir.2015) ("[Appellant] waived any potential challenge to that conclusion by failing to address it in his opening brief on appeal.").

. As to the breadth of the Board’s Supplemental Order, we interpret it as declining to deduct any interim earnings, regardless of their source. Thus, interim earnings made from a new second job are treated the same as those made from increased hours at a preexisting second job. We acknowledge the NLRB's Casehandling Manual lends some support for distinguishing between interim earnings an employee makes by increasing hours at a preexisting second job from those made at a new second job. See N.L.R.B. Casehandling Manual, pt. 3, § 10554.4 (2014), https://www. nlrb.gov/reports-guidance/manuals. Specifically, section 10554.4 indicates that if an employee “held a second job prior to the unlawful action and then increased the hours of employment at that job during the backpay period, earnings derived from the increase in hours are deductible interim earnings.” But we interpret the Board’s decision here as limiting the applicability of section 10554.4 and all other rules regulating interim-earnings calculations to cases involving a cessation of employment. The Casehandling Manual itself has signaled as much, noting in its overview *776 of the Interim Earnings section that "In Community Health Services, Inc., d/b/a Mimbres Memorial Hospital, 361 NLRB No. 25 (2014), the Board held that it would 'declin[e] to deduct interim earnings when applying the Ogle Protection Service backpay formula for cases involving economic loss but no cessation of employment.’ ” Id. § 10550.1 (alterations in original) (footnote omitted). Therefore, while section 10554.4 remains in force for all cessation cases, the Board.has clarified that it is inapplicable in cases like this one because interim earnings from any source are no longer relevant.

. The Hospital would exclude earnings made from secondary work the employee held prior to the Hospital's unlawful action.