FILED
United States Court of Appeals
Tenth Circuit

January 20, 2016

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

NATIONAL LABOR RELATIONS
BOARD,

     Petitioner,

v.

COMMUNITY HEALTH SERVICES,
INC., d/b/a Mimbres Memorial Hospital
and Nursing Home,

     Respondent.

------------------------------
UNITED STEEL, PAPER AND
FORESTRY, RUBBER,
MANUFACTURING, ENERGY, ALLIED
INDUSTRIAL AND SERVICE
WORKERS INTERNATIONAL UNION,

     Intervenor.

No. 14-9614

_____

**Appeal from the National Labor Relations Board**
**(NLRB No. 28-CA-016762)**
_____

Kaitlin Kaseta, Charleston, South Carolina (Bryan T. Carmody, Carmody & Carmody
LLP, Glastonbury, Connecticut, on the briefs), for Respondent.

Milakshmi V. Rajapakse, Attorney (Robert J. Englehart, Supervisory Attorney,
Richard F. Griffin, Jr., General Counsel, Jennifer Abruzzo, Deputy General Counsel,
John H. Ferguson, Associate General Counsel, and Linda Dreeben, Deputy Associate
General Counsel, with her on the briefs), National Labor Relations Board, Washington,
D.C., for Petitioner.

_____

Before **TYMKOVICH**, Chief Judge, **GORSUCH**, and **McHUGH**, Circuit Judges.

_____

**McHUGH**, Circuit Judge.

_____

## I.  INTRODUCTION

This challenge to the National Labor Relations Board's (the Board) petition for enforcement questions whether the Board may disregard interim earnings when calculating backpay awards for employees whose labor injury falls short of unlawful termination. Respondent Mimbres Memorial Hospital and Nursing Home (the Hospital) argues the Board failed to provide adequate support for its decision to disregard interim earnings and therefore requests that we reverse the Board's backpay calculation. We defer to the Board's policy-based rationale in support of its remedial decision and affirm and enforce its order.

## II. BACKGROUND

### A. *The Unfair Labor Practice Allegations and Proceedings*

The complicated procedural history of this case stems from the Hospital's 1999 decision to reduce the hours of its full-time, respiratory-department employees. *Cmty. Health Servs., Inc.*, 342 N.L.R.B. 398, 400–02 (2004). As a result of this reduction in hours, the United Steelworkers of America, District 12, Subdistrict 2, AFL-CIO, a union representing respiratory-department employees under an exclusive collective bargaining agreement, filed charges against the Hospital on behalf of the impacted employees. Based on these allegations, the Board's General Counsel filed a complaint with the Board, asserting the Hospital had violated § 8(a)(1), (5) of the

2

National Labor Relations Act (the Act or NLRA), 29 U.S.C. § 158. The Board

ultimately agreed and ordered the Hospital to "make whole any employee for any

loss of earnings and other benefits suffered as a result of its unlawful actions." *Cmty.*

*Health Servs., Inc.*, 342 N.L.R.B. at 404. On petition for review in this court, we

enforced the Board's order in whole. *NLRB v. Cmty. Health Servs., Inc.*, 483 F.3d

683 (10th Cir. 2007).

### B. The Compliance Proceedings

The case proceeded to the compliance phase, where an administrative law

judge (ALJ) determined the Hospital owed thirteen current and former employees

approximately $105,000 in backpay. *Cmty. Health Servs., Inc.*, No. 28-CA-16762,

2010 WL 3285384 (N.L.R.B. Div. of Judges July 28, 2010). In arriving at this

amount, the ALJ rejected the Hospital's argument that any income an employee had

earned from secondary employment during the backpay period—i.e., interim

earnings—should be deducted from that employee's backpay calculation. *Id.*

In reaching that conclusion, the ALJ applied a backpay formula the Board first

pronounced in *Ogle Protection Services, Inc.*, 183 N.L.R.B. 682 (1970). In *Ogle*, the

Board determined that interim earnings should not be deducted from backpay awards

when the underlying violation is something other than wrongful termination of

employment. 138 N.L.R.B. at 683. The Board in *Ogle* apparently presumed that

employees who remain employed by the wrongdoing employer will not make interim

earnings. *Id.* Here, the ALJ determined that application of the *Ogle* formula was

appropriate because to hold otherwise "would have the effect of imposing a duty on

3

employee victims of an unfair labor practice to moonlight in order to minimize the impact of the unlawful conduct for the benefit of the wrongdoer." *Cmty. Health Servs.*, 2010 WL 3285384.

The Hospital filed exceptions and supporting briefs to the Board, challenging the ALJ's decision. But in its Compliance Order, the Board affirmed the ALJ's rulings, findings, and conclusions. *Cmty. Health Servs., Inc.*, 356 N.L.R.B. No. 103, slip op. at *18 (Feb. 28, 2011).

The Hospital next petitioned the United States Court of Appeals for the District of Columbia[1] for review of the Board's Compliance Order. *Deming Hosp. Corp. v. NLRB*, 665 F.3d 196 (D.C. Cir. 2011). The D.C. Circuit rejected the Board's interpretation of *Ogle* and the Board's concern that deducting interim earnings would impose a duty to moonlight on the victims of wrongful hour reductions. *Id.* at 200. The circuit court further explained that the Compliance Order conflated two distinct concepts: an employee's duty to mitigate (which is nonexistent when there is no cessation of employment) and the "rules governing when backpay should be reduced by interim earnings." *Id.*

The D.C. Circuit also noted that, since *Ogle*, the Board had been inconsistent in its approach to calculating backpay in the absence of a cessation of employment. *Id.* at 201. In light of this unclear precedent, the court ruled the Board had not

---

[1] Under 29 U.S.C. § 160(f), a party "aggrieved by a final order of the Board" may obtain review of the order "in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia."

4

adequately explained its rationale for refusing to consider interim earnings here. It therefore remanded the Compliance Order "for a more thorough analysis of the issue." *Id.*

On remand, the Board issued a Supplemental Order reaffirming its original ruling. *Cmty. Health Servs., Inc.*, 361 N.L.R.B. No. 25, slip op. (Aug. 25, 2014). The Board identified the sole issue on remand as "whether the Board should deduct an employee's interim earnings from other employment when calculating backpay in cases where the employee suffers no cessation of employment with the wrongdoing respondent-employer and has no duty to mitigate by seeking interim employment" and concluded that "the deduction of interim earnings in this situation would not best effectuate statutory policy." *Id.* at *1. In reaffirming its prior conclusion, the Board provided five new policy justifications for its choice of remedy. Specifically, the Board explained that declining to deduct interim earnings where there is no cessation of employment (1) encourages employment and production, (2) is more consistent with the Board's policy of not deducting interim earnings obtained from work performed above and beyond an employee's duty to mitigate, (3) better accounts for the hardships that arise when taking on secondary employment, (4) discourages employers from engaging in dilatory conduct such as delaying compliance with an order to rescind unfair labor practices, and (5) prevents a windfall to the wrongdoing employer. *Id.* at *7–*9. Although the Board acknowledged the existence of some inconsistent precedent on this issue, it argued that the cases in which it "inadvertently" deducted interim earnings from backpay calculations "represent a

tiny fraction of the hundreds of cases" in which the Board declined to deduct the interim earnings of employees whose injuries fall short of unlawful termination. *Id.* at *7. Based on these considerations, the Board reaffirmed its prior backpay order, concluding that "important statutory policies strongly support a practice of declining to deduct interim earnings when applying the *Ogle Protection Service* backpay formula for cases involving economic loss but no cessation of employment." *Id.* at *9.

Next, General Counsel filed an application in this court for enforcement of the Board's decision, and the Hospital responded in opposition. We exercise jurisdiction under 29 U.S.C. § 160(e), (f).

## III.   DISCUSSION

On this petition for enforcement, we are asked to determine whether the Board provided sufficient support for its decision to exclude interim earnings from backpay calculations when the employer has wrongfully reduced employee hours, but not terminated employment. The Hospital contends the Board's Supplemental Order is inadequate, arguing the Board's reliance on *Ogle Protection Service, Inc.*, 183 N.L.R.B. 682 (1970), is flawed and its policy justifications are unfounded. General Counsel contends the Board selected a reasonable remedy that is in line with the policies underlying the NLRA.

The Board's power to award backpay arises under §10(c) of the NLRA, which permits the Board to "take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of [the Act]."

6

29 U.S.C. § 160(c). Because a backpay award is "only an approximation," the Board "has considerable discretion in selecting a method reasonably designed to approximate the amount of pay" due to a wronged employee. *NLRB v. Velocity Express, Inc.*, 434 F.3d 1198, 1202 (10th Cir. 2006) (internal quotation marks omitted). On review of a backpay order, our task is narrow. *See id.* ("The NLRB's power to order backpay is a broad, discretionary one, 'subject to limited judicial review.'" (quoting *Fibreboard Corp. v. N.L.R.B.*, 379 U.S. 203, 216 (1964))). We will not disturb the Board's remedial decision unless it is "arbitrary or unreasonable," or, in other words, "is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the NLRA." *Id.* (brackets and internal quotation marks omitted).

It is through this deferential lens that we assess the Hospital's opposition to the Board's Supplemental Order. We first review the Board's interpretation of *Ogle* and its progeny, and we then turn to the Hospital's criticism of the Board's policy justifications.

### A. *The Supplemental Order Properly Interpreted* Ogle

To properly assess the Board's application of its decision in *Ogle*, we begin by explaining the Board's historical approach to two underlying concepts: the duty to mitigate and the calculation of backpay awards.

### 1. Board Precedent Regarding the Duty to Mitigate and Backpay Calculations

First, we consider the duty to mitigate. Under longstanding Board and Supreme Court precedent, employees who believe they have been unlawfully

7

terminated have a duty to seek out substitute employment while they await a Board decision on that issue. *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 199–200 (1941) (recognizing the Board's power to "give appropriate weight to a clearly unjustifiable refusal to take desirable new employment" when calculating backpay). Although the Board and courts frequently refer to this obligation as a duty to mitigate, the term is somewhat of a misnomer because the motivation for the obligation is more "the healthy policy of promoting production and employment" than "the minimization of damages." *Id.*

Where unlawfully terminated employees are under an obligation to seek work, the policy holds that backpay calculations logically should include a deduction for interim earnings. Without such a deduction, employees who are willing to bet on the outcome of the claims against the former employer or whose short-term financial needs are minimal would have little incentive to comply with their mitigation obligation. Instead, they could wait for a favorable decision from the Board to make them whole. The duty to seek interim employment gives these employees an incentive to remain productive during the period the claims against the former employer are unresolved.

Conversely, employees who are not unlawfully terminated but suffer other labor injuries—e.g., reduction in hours or wage—have no duty to seek secondary employment pending a decision on their unfair labor practices claim. *See 88 Transit Lines, Inc.*, 314 N.L.R.B. 324, 325 (1994) (explaining that employees who are not discharged are not required "as part of any mitigation obligation, to obtain additional

8

replacement work from some other employer during the backpay period"). But some employees who are unable to wait for the outcome of an NLRB action will make up the lost hours with supplemental work despite the lack of any legal duty to do so. The fact that employees who have no duty to seek secondary employment may nevertheless do so raises the question of whether the Board should account for such interim earnings when calculating a backpay award.

The Board's two seminal backpay decisions—*F.W. Woolworth, Co.*, 90 N.L.R.B. 289 (1950), and *Ogle Protection Service, Inc.*, 183 N.L.R.B. 682 (1970)— do not squarely address this issue. In *Woolworth*, the Board sought a method of curtailing employers' incentive to delay reinstating wrongfully terminated employees.[2] Because the wrongfully terminated employee has a duty to seek interim employment, the longer the employer waited to reinstate the injured employee, "the greater would be the reduction in back-pay liability," and the greater the likelihood the employee would find higher paying employment and reject an offer of reinstatement. *Woolworth*, 90 N.L.R.B. at 292. *Woolworth* remedied this problem by instituting a quarterly backpay formula, through which the Board subtracts the employees' interim earnings in each quarter from what the employees would have

---

[2] Before the Board decided *F.W. Woolworth, Co.*, 90 N.L.R.B. 289 (1950), it calculated backpay "by subtracting what an employee actually earned during the entire backpay period from what she would have earned during that period had the unlawful action not occurred." *Deming Hosp. Corp. v. NLRB*, 665 F.3d 196, 199 (D.C. Cir. 2011); *see also Pennsylvania Greyhound Lines, Inc.*, 1 NLRB 1, 51 (1935) (calculating a backpay award by determining what the employee would have earned from the noncompliant employer during the backpay period, "less the amount which each [employee] earned subsequent to discharge").

9

earned from the wrongdoing employer during that same quarter, had they not been terminated. *Id.* at 292–93. Under this formula, interim earnings made in prior quarters have no impact on the backpay calculation for subsequent quarters, and vice versa. For example, if an employee suffered lost pay before securing interim employment, the employer could not avoid paying that amount based on the employee's success in finding a higher paying job in a subsequent quarter.

*Ogle*, on the other hand, involved employees who had not been unlawfully terminated, and thus had no duty to mitigate, but who were otherwise injured when their employer repudiated the terms of a collective bargaining agreement. 183 N.L.R.B. at 683. In *Ogle*, the Board concluded that *Woolworth*'s "quarterly computation is unnecessary and unwarranted" in cases that do not "involve cessation of employment status or interim earnings that would in the course of time reduce backpay." *Id.* The Board therefore held that the *Woolworth* formula is not applicable where there is no cessation of employment, apparently failing to anticipate that employees who are not terminated may nonetheless be motivated to seek secondary employment if, for example, the employer's unfair labor practices result in reduced wages or hours. As a result, the Board did not clearly address in *Ogle* whether backpay awards should be reduced by interim earnings in cases where there is no cessation of employment and therefore no duty to mitigate.[3]

---

[3] In creating the exception to the *Woolworth* formula, the Board in *Ogle* explained that a quarterly computation is unnecessary for "a violation of the Act which does not involve cessation of employment status *or interim earnings that would in the course of time reduce backpay.*" *Ogle Prot. Serv., Inc.*, 183 N.L.R.B.

10

**2. The Board's Assessment of *Ogle* in the Supplemental Order**

With this backdrop in mind, we turn to the Board's discussion of *Ogle* in its Supplemental Order. The Board acknowledged that "the literal language of *Ogle Protection Service* does not compel the conclusion that interim earnings, where proven, should not be deducted in cases where there is no job loss." *Cmty. Health Servs., Inc.*, 361 N.L.R.B. No. 25, slip op. at *7 (Aug. 25, 2014). The Board also recognized that in at least six of its prior decisions, it allowed for the deduction of interim earnings where there was no cessation of employment. *Id.* at *6 (citing to *Atlantis Health Care Group (P.R.) Inc.*, 356 N.L.R.B. No. 26, slip op. at *1 (Nov. 15, 2010); *Willamette Industries*, 341 N.L.R.B. 560, 564–565 (2004); *Quality House of Graphics*, 336 N.L.R.B. 497, 516–517 (2001); *Ironton Publications*, 313 N.L.R.B. 1208, 1208 n. 4 (1994); *Consumers Asphalt Co.*, 295 N.L.R.B. 749, 752 (1989); and *Ford Bros.*, 284 N.L.R.B. 211, 211–12 (1987)). But the Board indicated that any reference to the deduction of interim earnings in these cases was "inadvertently

_____

682, 683 (1970) (emphasis added). Thus, *Ogle* could be limited to cases where there is neither a cessation of employment nor interim earnings. Under this reading, when an employee makes interim earnings during the backpay period, the *Woolworth* formula would apply irrespective of whether there has been a cessation of employment. But the Hospital has not advanced this reading. Instead, the Hospital, the Board, and the D.C. Circuit all agree that *Ogle* does not clearly address the present issue. And even if it did, the Board is free to reconsider its position with the benefit of specific facts, so long as the new remedy aligns with the NLRA's underlying policies. *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 787 (1990) ("[A] Board rule is entitled to deference even if it represents a departure from the Board's prior policy.").

mistaken, rather than intentional" and that they "represent a tiny fraction of the hundreds in which *Ogle Protection Service* has been correctly cited and applied." *Id.* at \*7. Notwithstanding these cases to the contrary, the Board expressed that its general policy "has been to preclude the deduction of interim earnings from other jobs when applying *Ogle Protection Service* to remedy employees' monetary losses where there is no cessation of employment and attendant duty to mitigate damages." *Id.*

The Hospital takes issue with the Board's analysis of *Ogle* and its progeny, contending the Board was merely speculating when it described the decisions in which it deducted interim earnings, despite no cessation of employment, as "inadvertently mistaken." Instead, the Hospital argues these decisions demonstrate that, until now, the Board has never expressly declined to deduct interim earnings in cases that do not involve a cessation of employment, and at best, the Board has been inconsistent in its approach to backpay calculations in such cases.

We agree with the Hospital that the Board's precedent has been unclear. But in its Supplemental Order, the Board acknowledges this inconsistency and the need to adopt a consistent approach for future cases.[4] Thus, while the Board did not

---

[4] Although inconsistent guidance from the Board could raise fair notice concerns, the Hospital has not made a fair notice argument in the proceedings before the Board, or in its appellate briefing. We therefore lack the power to consider this issue. 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."); *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665 (1982) (concluding that § 160(e) deprives appellate courts of jurisdiction to consider

sufficiently address its inconsistent precedent in the original Compliance Order, we are satisfied that in its Supplemental Order, the Board adequately acknowledged its anomalous decisions and correctly characterized *Ogle* and its progeny. We therefore reject the Hospital's invitation to overturn the Supplemental Order based on the Board's *Ogle* analysis.

### B. The Board's Policy Justifications Were Reasonable

We turn next to the Board's policy justifications for concluding that interim earnings should not be deducted from backpay awards when there has been no cessation of employment.[5] Because of the deference we owe to the Board's remedial

---

issues "not raised during the proceedings before the Board"); *see also Davis v. McCollum*, 798 F.3d 1317, 1320 (10th Cir. 2015) ("[Appellant] waived any potential challenge to that conclusion by failing to address it in his opening brief on appeal.").

[5] As to the breadth of the Board's Supplemental Order, we interpret it as declining to deduct any interim earnings, regardless of their source. Thus, interim earnings made from a new second job are treated the same as those made from increased hours at a preexisting second job. We acknowledge the NLRB's Casehandling Manual lends some support for distinguishing between interim earnings an employee makes by increasing hours at a preexisting second job from those made at a new second job. *See N.L.R.B. Casehandling Manual*, pt. 3, § 10554.4 (2014), https://www.nlrb.gov/reports-guidance/manuals. Specifically, section 10554.4 indicates that if an employee "held a second job prior to the unlawful action and then increased the hours of employment at that job during the backpay period, earnings derived from the increase in hours are deductible interim earnings." But we interpret the Board's decision here as limiting the applicability of section 10554.4 and all other rules regulating interim-earnings calculations to cases involving a cessation of employment. The Casehandling Manual itself has signaled as much, noting in its overview of the Interim Earnings section that "In *Community Health Services, Inc., d/b/a Mimbres Memorial Hospital,* 361 NLRB No. 25 (2014), the Board held that it would 'declin[e] to deduct interim earnings when applying the *Ogle Protection Service* backpay formula for cases involving economic loss but no cessation of employment.'" *Id.* § 10550.1 (alterations in original) (footnote omitted). Therefore,

decision, our limited role is to determine whether the Board's policy justifications represent "a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the NLRA." *NLRB v. Velocity Express, Inc.*, 434 F.3d 1198, 1202 (10th Cir. 2006) (brackets and internal quotation marks omitted). These policies include "the promotion of industrial peace, the prevention of unfair labor practices and protection for victimized employees." *Dayton Tire & Rubber Co. v. NLRB*, 591 F.2d 566, 570 (10th Cir. 1979); *see also Nathanson v. NLRB*, 344 U.S. 25, 27 (1952) ("A back pay order is a reparation order designed to vindicate the public policy of the statute by making the employees whole for losses suffered on account of an unfair labor practice."); 29 U.S.C. § 151 (declaring the policies of the NLRA). In its Supplemental Order, the Board described five policy reasons for its decision. We address each rationale in turn to determine whether it fairly aligns with the policies of the NLRA.

## 1. Encouraging Production and Employment

First, the Board reasoned that deducting interim earnings from backpay calculations in this context would discourage production and employment by making employees who seek additional work no better off than their counterparts who remain underemployed. *Cmty. Health Servs., Inc.,* 361 N.L.R.B. No. 25, at *7. As the Board noted, "by declining to deduct interim earnings absent a cessation of employment, we

---

while section 10554.4 remains in force for all cessation cases, the Board has clarified that it is inapplicable in cases like this one because interim earnings from any source are no longer relevant.

14

offer employees a greater incentive to voluntarily seek interim employment, thereby affirmatively promoting production and employment." *Id.* (internal quotation marks omitted). In support of its reasoning, the Board turned to *Phelps Dodge Corp. v. NLRB*, in which the Supreme Court relied on the same underlying policy to justify the imposition of a duty to mitigate and the deduction of interim earnings, including amounts "which the workers 'failed without excuse to earn,'" where there has been an unlawful cessation of employment. 313 U.S. 177, 200 (1941).

Although it is seemingly counterintuitive to use the rationale underlying the duty to mitigate in cases where no such duty exists, the goal of promoting production and employment is advanced in both instances. In wrongful termination cases, employees know their backpay award will be reduced by imputed interim earnings if they breach their duty to mitigate and are motivated to seek actual employment. Likewise, where the violation does not involve the cessation of employment, employees who have no duty to mitigate will be encouraged to seek supplemental employment if they can retain the benefit of that effort. Although the extent to which productivity is impacted is greater in a termination case, we are not convinced the Board's reliance on this rationale in a case where there is no cessation of employment constitutes a patent attempt to achieve ends contrary to those that can be said to fairly effectuate the goals of the NLRA. This is so even though promoting production is not one of the NLRA's express policy objectives because, as the Supreme Court stated in *Phelps Dodge Corp.*, "[t]his consideration in no way weakens the enforcement of the policies of the Act." *Id.*

15

## 2. Rewarding "Extra Effort"

Second, the Board posited that declining to deduct interim earnings in this situation is more consistent with its backpay calculations in other contexts. *Cmty. Health Servs., Inc.,* 361 N.L.R.B. No. 25, at *7. Specifically, the Board analogized employees who have a duty to mitigate but go above and beyond that duty with employees who have no mitigation duty but nonetheless obtain additional work. Under established Board policy, employees who perform more work than required are entitled to retain the benefit of such "extra effort." *See N.L.R.B. Casehandling Manual*, pt. 3, § 10554.3 (2014), https://www.nlrb.gov/reports-guidance/manuals, (explaining in the context of employees who have a duty to mitigate, "only interim earnings based on the same number of hours as would have been available at the gross employer should be offset against gross backpay"). Through this policy, the Board rewards the employees who do more than is required, rather than the wrongdoing employer. *See In re Center Constr. Co.*, 355 N.L.R.B. 1218, 1221 (2010) ("[I]f a diligent backpay claimant chooses to work additional overtime during interim employment it should operate to his advantage not that of the employer required to make him whole for a discriminatory discharge."); *EDP Med. Comput. Sys.*, 293 N.L.R.B. 857, 858 (1989) ("A backpay claimant who chooses to do the extra work and earn the added income made available on the interim job may not be penalized by having those extra earnings deducted from the gross backpay owed by the Respondent." (internal quotation marks omitted)). The Board reasoned it should similarly reward employees who take on additional work in the absence of any

16

obligation to do so by not deducting the interim earnings that result from their extra efforts. *Id.*

The Hospital challenges this policy justification by advancing a different definition of "extra effort." In contrast with the Board's definition, which equates extra effort with any work employees perform beyond their legal obligation, the Hospital would define extra effort as work employees perform beyond what they would have done for the noncompliant employer. In this case, for example, the Hospital unlawfully reduced its respiratory-department employees' hours from forty hours to between thirty-six and thirty-two per week. Under the Hospital's definition, "extra effort" would mean any work employees completed for a secondary employer during the backpay period that exceeded the four to eight hours per week necessary to meet a forty-hour work week.[6]

Although the Board could have adopted either version, we will uphold its definition of extra effort for purposes of fashioning an appropriate remedy unless the choice conflicts with the policies of the NLRA. We see no such conflict here.

### 3. Accounting for Additional Hardships

Third, the Board justified its decision to ignore interim earnings through its observation that an employee who seeks work from a secondary employer generally suffers additional hardships, "such as resolving scheduling conflicts between the two jobs and traveling to a second workplace." *Cmty. Health Servs.*, 361 N.L.R.B. No. 25

---

[6] The Hospital would exclude earnings made from secondary work the employee held prior to the Hospital's unlawful action.

at *8. By allowing the employee to retain the benefit of undertaking these hardships, the Board's policy "acknowledge[s] these practical considerations and encourage[s] employees to address their financial situations contemporaneously." *Id.*

The Board could have conceivably accounted for some of these hardships by requiring the wrongdoing employer to reimburse its employees for the costs associated with working a second job, such as travel expenses. *See Crossett Lumber Co.*, 8 NLRB 440, 497 (1938) (discussing reimbursement for travel expenses in the context of wrongfully terminated employees who found new employment). But not all hardships an employee suffers when juggling two jobs are so tangible. For example, it would be impractical, if not impossible, to ascribe a dollar amount to the difficulties associated with resolving scheduling conflicts or accommodating the demands of two employers. *See Cmty. Health Servs., Inc.*, 361 NLRB No. 25 at *8 ("[T]he employee whose hours or wages have been unlawfully reduced continues to work for the wrongdoing employer and must adjust any outside employment hours to accommodate that employer's demands."). Therefore, by declining to deduct interim earnings from backpay awards in this context, the Board's decision better addresses these intangible hardships.

The Hospital does not disagree that employees who work a second job while remaining employed by the wrongdoing employer may face these added obstacles. But it nonetheless challenges the Board's reliance on this rationale because General Counsel put forth no evidence of any additional hardships the employees actually suffered in this case. But we are not convinced General Counsel was required to

18

introduce such evidence or that the Board needed to make specific findings on this issue. The Board articulated a general policy that will apply beyond the facts of this case. In doing so, "the Board is not confined to the record of a particular proceeding." *NLRB v. Seven-Up Bottling Co. of Miami*, 344 U.S. 344, 349 (1953). Rather, the Board may rely on its "[c]umulative experience," which "begets understanding and insight by which judgments not objectively demonstrable are validated or qualified or invalidated." *Id.*

When applying its general remedial policy to the facts of this case, the Board was required to consider any unique circumstances that would make the remedy's "application to [the] particular situation oppressive and therefore not calculated to effectuate a policy of the Act." *Id.* But the Hospital, not General Counsel, had the burden of putting forth evidence demonstrating the existence of unique circumstances. *See Velocity Express*, 434 F.3d at 1203 ("[Respondent] had the burden of proof on mitigation of its backpay obligation."); *Hansen Bros. Enters.*, 313 N.L.R.B. 599, 600 (1993) ("[T]he Respondent had the burden of showing why any modifications should be made to the amounts set forth in the backpay specification."). Although the Hospital contends it was deprived of an opportunity to discover any such evidence, its discovery requests in the NLRB proceedings pertained only to general evidence regarding the affected employees' interim earnings. The Hospital never requested discovery regarding whether any of those employees who made interim earnings suffered added hardships. Moreover, even if the Hospital had put forward evidence demonstrating the added-hardships rationale

19

does not apply to all of the affected employees here, the other justifications for the Board's policy decision would remain intact. The Board therefore acted reasonably in fashioning a remedy based on its cumulative experience that employees who take on secondary employment will generally confront added hardships.

### 4. Preventing Dilatory Conduct

Fourth, the Board explained that the potential for an employer to engage in dilatory conduct similar to that which prompted it to adopt the *Woolworth* formula is present when an employer unlawfully reduces hours or wages. *Cmty. Health Servs.*, 361 N.L.R.B. No. 25 at *9. The Board reasoned that deducting interim earnings from a backpay calculation would create an incentive for wrongdoing employers to delay rescinding their unlawful conduct, "knowing that the longer an employee worked a second job, the greater could be the reduction in backpay owed." *Id.* The Board explained that declining to deduct interim earnings in this context has the same deterrent effect as the quarterly computation has in the context of an unlawful termination. *Id.*

The Hospital acknowledges the Board's remedy would have this deterrent effect, but argues the Board could simply have applied the *Woolworth* formula in this context to achieve the same result. But so long as the Board provides reasonable support for its selection of remedies and its rationale aligns with the policies of the Act, we will not second guess the Board's choice. *Velocity Express*, 434 F.3d at 1202. Thus, although the Board could have adopted the *Woolworth* formula in noncessation cases and reduced back pay awards by quarter based on interim

20

earnings, it was not required to do so. Where the remedy chosen by the Board does not conflict with the goals of the NLRA, we defer to the Board's decision.

**5.  Allocating Windfalls**

Finally, the Board considered the benefits conferred on the employer and employee by the alternative approaches to calculating backpay under the present circumstances. On the one hand, the Board concluded that deducting interim earnings when an employee has no obligation to seek additional work "would represent an unwarranted windfall to the employer and discourage compliance with the law." *Cmty. Health Servs.*, 361 N.L.R.B. No. 25, at *8. Alternatively, however, if interim earnings are not deducted, the Board acknowledged that the employee may enjoy a windfall by collecting backpay and interim wages that total more than the employee would have earned in the absence of a violation. The Board ultimately concluded that where one of the parties will obtain a windfall, it is more appropriate for it to be the employee whose extra effort resulted in the interim earnings, rather than the recalcitrant employer. *See United Aircraft Corp.*, 204 N.L.R.B. 1068, 1073 (1989) (explaining that the Board is not concerned if an employee is made "more than 'whole'" as a result of "extra effort"). Thus, in selecting between two imperfect remedies, the Board expressed its preference for the one that requires the employer to pay the full amount of backpay, while permitting the employees to retain the benefit of their extra effort. The Board concluded this was preferable to adopting a remedy that would reduce the wrongdoing employer's liability while treating the industrious employees no better than those who do nothing.

21

And we cannot agree with the Hospital's argument that the potential for a windfall to the employee makes the Board's remedy punitive and therefore impermissible. *See Republic Steel Corp. v. NLRB*, 311 U.S. 7, 12 (1940) ("[T]he [Board's] power to command affirmative action is remedial, not punitive."). Under the Board's remedy, the Hospital is not required "to do more than make [the employees] whole for the loss of earnings suffered as a result of [their] unlawful [reduction in hours]." *United Aircraft Corp.*, 204 N.L.R.B. at 1073. The interim earnings are unrelated to the loss of earnings caused by the employer's wrongdoing. Instead, those earnings are the result of the employees' extra effort in working a second job, despite no obligation to do so. Thus it is the employees, not the employer, who make themselves more than whole. The Board's remedy does not require the Hospital to pay more than the extent of the injury it caused and does not impose a fine or other penal consequence. It is therefore not impermissibly punitive.

In summary, the Board provided reasonable justifications for declining to deduct interim earnings in cases where there is no cessation of employment. Although other reasonable remedies undoubtedly exist, so long as the Board's selected remedy is not contrary to the policies of the NLRA, we must defer to its remedial choice.

## IV.  CONCLUSION

For the reasons explained above, we affirm and enforce the Board's Supplemental Order.

22

No. 14-9614, *NLRB v. Community Health Services, Inc.*

**GORSUCH**, Circuit Judge, dissenting.

The NLRB's order effectively seeks to adopt a new rule governing the calculation of backpay in cases where a collective bargaining employer unlawfully reduces the hours of unionized employees. There can, of course, be no doubt that Congress has invested the Board with considerable power to shape labor relations in this country and to provide remedies like backpay in response to employer misconduct. But in our legal order federal agencies must take care to respect boundaries of their congressional charters. They may not treat similarly situated classes of persons differently without a rational explanation. And they may not depart from their own existing rules and precedents without a persuasive explanation. *See, e.g.*, *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983). Respectfully, I believe the NLRB's new rule fails to abide each of these settled legal principles and, in that way, seeks to make new law unlawfully.

Since 1935 Congress has tasked the Board with the job of "eliminat[ing] the causes of certain substantial obstructions to the free flow of commerce" by promoting collective bargaining. 29 U.S.C. § 151. In aid of that expansive charge, Congress has endowed the Board with considerable remedial authority. If and when it should find that an employer subject to its jurisdiction has engaged in an unlawful labor practice, the Board may issue an order "requiring such person to cease and desist from such unfair labor practice, and to take such affirmative

action including reinstatement of employees with or without backpay, as will effectuate the policies" of the Act. 29 U.S.C. § 160(c).

Over the last eighty years, the Board has developed a finely reticulated set of rules aimed at implementing these statutory directives. Of special relevance in this case about backpay, the Board has held that when an employer unlawfully fires an employee or reduces her hours the employer must pay all the wages the employee lost as a result. *N.L.R.B. Casehandling Manual*, pt. 3, § 10536.1. At the same time, this general rule sometimes yields to more specific ones in order to avoid over- or under-compensating the employee. So, for example, after an unlawful labor action an employee may find a new job or increase her hours at a pre-existing second job and in that way replace some or all of her lost wages. Allowing the employee in these circumstances to keep both her "interim earnings" and a full backpay award would mean she'd be paid twice for the same hours, leaving her better off than she would have been but-for the employer's misconduct. To avoid this sort of "windfall" the Board has, from its first order and still to this day, generally deducted interim earnings from its backpay awards. *In re Pa. Greyhound Lines, Inc.*, 1 N.L.R.B. 1 (1935); *N.L.R.B. Casehandling Manual*, pt. 3, § 10554. Indeed, if the employer can prove the employee could've found a second job after being unlawfully fired but unreasonably refused the work, the employee's intentionally forgone interim earnings may also be deducted from a backpay award. *N.L.R.B. Casehandling Manual*, pt. 3, § 10558.1. At the

same time, though, if the employee incurs costs in finding or retaining a second job thanks to the employer's misconduct, those costs are fully compensable. *Id.* § 10555. And if in the second job the employee takes on "extra work" — working hours beyond those she would otherwise have spent with the wrongdoing employer — compensation for that extra work remains hers and isn't used to offset any backpay award. *Id.* § 10554.3. All of these additions and subtractions share the common aim of ensuring that a backpay award restores the employee to the same position she would've enjoyed but-for the employer's misconduct, without a windfall accruing to either employer or employee.

Now eighty years on, the Board seeks to carve out a class of cases from its tested and pretty ancient backpay procedures. When the employer unlawfully reduces the employee's hours to zero (termination cases), the Board says it will continue to employ its traditional backpay rules. But when the employer unlawfully reduces the employee's hours to anything short of zero (hours-reduction cases), the Board now says it will never, under any circumstances, deduct interim earnings from a backpay award. Thus treating cases that seem to differ mostly in degree as different in kind.

The hospital-employer in our case first challenged the Board's new carve-out rule for hours-reduction cases in the D.C. Circuit. There the Board tried to suggest that its new rule wasn't really anything new at all but compelled by an existing administrative decision, *Ogle Protection Service, Inc.*, 183 N.L.R.B. 682

-3-

(1970). The D.C. Circuit quickly exposed this claim as mistaken. Yes, the D.C. Circuit acknowledged, the Board in *Ogle* ordered backpay and authorized no deductions for interim earnings. But, the court observed, *Ogle* wasn't an hours-reduction case and the employees there had no interim earnings that could have been deducted from their backpay awards. Accordingly, the D.C. Circuit observed, *Ogle* just "does not address" hours-reduction cases where (as here) the employer does proffer evidence of interim employee earnings that might be deducted. *Deming Hosp. Corp. v. NLRB*, 665 F.3d 196, 200 (D.C. Cir. 2011). In fact, the D.C. Circuit noted, in many past hours-reduction cases the Board *has* ordered the deduction of proven interim earnings. *See id.* at 201 (citing examples). And the Board's own casehandling manual states that interim earnings deductions are generally appropriate with only a few exceptions — and hours-reduction cases are nowhere among those exceptions. *See N.L.R.B. Casehandling Manual*, pt. 3, § 10554.

Forced to acknowledge that its carve-out rule represents a departure from preexisting practice, the Board offered an alternative rationale in its defense. Now the Board argued that, in response to unlawful reductions in their hours, employees should not face a duty to seek out secondary employment — to mitigate their losses— like employees in termination cases do. For its part the D.C. Circuit noted that employees in termination cases have a duty to mitigate their losses in the sense that, if they refuse to take new work, they will have their

-4-

backpay award reduced by the amount of intentionally forgone income they could've earned. And for purposes of the appeal, the D.C. Circuit and hospital-employer accepted that there's a sound reason to avoid imposing a parallel duty to mitigate on employees in hours-reduction cases — because in hours-reduction cases employees seeking secondary work will have to work around the demands of their still-existing primary employer and may not be able to secure a replacement job or as many hours in a replacement job as the employee might wish. At the same time, the court noted, this consideration speaks only to a need to waive any duty to seek secondary employment in hours-reduction cases — to eschew backpay deductions when employees *don't* have interim earnings. It does not provide a rational basis for distinguishing between termination and hours-reduction cases when employees are able to and do choose to find other work — when employers *do* have interim earnings during the backpay period. Given all this, the D.C. Circuit held that the Board's "explanation for its refusal to consider interim earnings is inadequate" and remanded the matter for reconsideration. *Deming Hosp. Corp.*, 665 F.3d at 201.

Now the Board has tried again, and the hospital-employer has petitioned for review again — this time to our court. In an apparent abundance of caution the Board has offered five new rationales to replace the two the D.C. Circuit found wanting. But though the Board's rationales may now be more prolific, I do not find them more persuasive for it.

1. "Promoting Production and Employment." First and primarily the Board argues that its new policy of refusing to deduct interim earnings in hours-reduction cases will allow employees who take on second jobs to keep both their interim earnings and backpay for the same hours they would have worked for their primary employer. Of course this means a whole class of employees (those in hours-reduction cases who seek and win second jobs) won't be restored to the same position they would've been in but-for the employer's misconduct, but will be made better off instead. The Board accepts that its new rule creates an employee "windfall" in just this way and seemingly at odds with its prior practice. Yet it defends this consequence not as a bug in the design of its new rule but as its whole point. Promising employees double payment for the same hours, the Board says, will offer them a "greater incentive to voluntarily seek interim employment" and in this way advance the policy of "promoting production and employment." *Cmty. Health Servs., Inc.*, 361 N.L.R.B. No.25, slip op. at *7; *see* Maj. Op. at 14-15.

It seems to me that this line of argument fundamentally misconceives the Board's remedial charter. The Board's statutory charge isn't to promote full employment. *See* 29 U.S.C. § 151. It's not some sort of reincarnation of the Works Progress Administration. Instead, Congress invested the Board with the more prosaic — if still vital — job of providing "backpay" arising from "unfair labor practices." 29 U.S.C. § 160(c). And the Supreme Court has held that this

statutory charter means exactly what it says — allowing the Board to restore the "actual losses" employees suffer — no more or less. *Phelps Dodge v. NLRB*, 313 U.S. 177, 197-98 (1941). Yet, rather than seeking to restore the earnings employees would have enjoyed but-for the employer's misconduct, the Board's new rule candidly seeks to pursue a quite different and entirely extra-statutory objective — the promotion of "production and employment" — and to achieve that end it abandons any pretense of seeking to fulfill its duty of ensuring compensation for actual losses. The Supreme Court long ago rejected Board efforts to use its remedial backpay authority to pursue policy ends other than those specified by the NLRA. Back in the 1940s, and in words equally fitting here, the Court held that while the Board may freely pursue "remedial objectives which the Act sets forth," it is not licensed to pursue "a distinct and broader policy with respect to unemployment." *Republic Steel Corp. v. NLRB*, 311 U.S. 7, 12-13 (1940); *see also Phelps Dodge*, 313 U.S. at 197-98 (holding that the NLRA limits the Board's backpay authority to restoring "actual losses"). I do not see how we might come to a different conclusion today.

In saying this much, I hardly mean to suggest the Board lacks leeway in carrying out its remedial charge. Any attempt to recreate a lost but-for world and calculate losses due to a defendant's misconduct always requires a degree of estimation. As well, the Board must balance its two statutory remedial duties — providing backpay for actual losses and promoting reinstatement — and those two

-7-

duties can sometimes conflict in interesting and difficult ways. *See, e.g.*, *NLRB v. Seven-Up Bottling Co. of Miami*, 344 U.S. 344 (1953). Finally, the Supreme Court has observed that, when a backpay award *does* aim to restore "actual losses," its virtue may be additionally recommended by its capacity to promote employment because, in *that* scenario, the consideration of extra-statutory policies like that one "in no way weakens the enforcement of the policies of the Act." *Phelps Dodge*, 313 U.S. at 200. But none of these principles suffices to save the Board's order in this case. After all, no one before us disputes that the Board's existing and longstanding backpay rules allow it to supply employees with all of their actual losses in hours-reduction cases. The Board itself doesn't even attempt to suggest its new carve-out rule offers a superior way to calculate actual losses. Instead, the Board seeks to justify its new carve-out backpay rule exclusively on the ground that it will better promote an entirely distinct policy that lies beyond its statutory authority to pursue.

Besides exceeding its congressional charter, the Board's rationale faces still two more problems. In the first place, a consistent (non-arbitrary) application of its new rule would seem to forbid the deduction of interim earnings for *both* termination and hours-reduction cases. After all, if double pay for the same hours will encourage you to take on outside work when the hours in your primary job are reduced to something short of zero, it will encourage you to take on outside work in cases when the hours in your primary job are reduced to zero too.

Nothing about the Board's rationale is rationally confined to hours-reduction cases. Yet it's those cases alone the Board today wishes to carve out, without any explanation why. Beyond even that, by enforcing a backpay regime that is markedly more generous in hours-reduction cases than termination cases the Board's new rule would seem to create a paradoxical incentive for employers to engage in behavior even more inimical to the "promotion of production and employment" — pushing them in marginal cases toward termination and away from hours-reductions in order to reduce their backpay liability. Yet another problem the Board neither ponders nor offers reason for disregarding.

2. "Rewarding Extra Work." If its primary rationale should fail, the Board argues alternatively that its new carve-out rule is justified by the "well established" principle found in § 10554.3 of its casehandling manual providing that "[i]n cases where a discriminatee worked substantially more hours for an interim employer than he or she would have worked for the gross employer, only interim earnings based on the same number of hours as would have been available at the gross employer should be offset against gross backpay." *N.L.R.B. Casehandling Manual*, pt. 3, § 10554.3.

By its terms, however, this provision can be fairly described as no better than irrelevant. Section 10554.3 merely provides that an employee gets to keep interim earnings for hours above and beyond those she would have worked at the original employer — promising that the employee can always retain earnings from

a true second or "moonlighting" job. And exactly none of this is at issue here. Everyone before us readily accepts that the sort of wages § 10554.3 discusses belong to the employee. The only question presented in this case is what to do about earnings for those hours the employee would have worked for the original employer but-for the unlawful action — and on that question § 10554.3 stands mute.

Maybe the Board's citation to § 10554.3 is meant less than literally, as a sort of analogy. Maybe the Board means to suggest that, just as an employee shouldn't have her backpay hours reduced for hours *beyond* those she could have worked at her employer, she shouldn't *ever* have her hours reduced for taking on a second job when she didn't have to. But if that's the analogy that's intended, it's one that fails. It fails because the point of § 10554.3 is to ensure that the employee is made whole for her actual losses by guaranteeing that her backpay award isn't reduced by earnings she would have enjoyed whether or not her primary employer engaged in an unfair labor practice. Section § 10554.3 removes from the backpay analysis interim earnings without a causal connection to the employer's misconduct. The rule is, in this way, all about helping create an accurate picture of what the world would've looked like but-for the employer's misconduct — and in that way all about helping fulfill the Board's statutory remedial charge. Meanwhile, the Board's new carve-out rule has again (and admittedly) nothing to do with its statutory charter. The Board doesn't attempt to

-10-

defend its new rule on the ground that it helps create a more accurate picture of an employee's actual losses. Or that it has anything to do with that purpose at all. Instead, it argues the rule aims to reward "extra work" in the very particular (and very different) sense that, thanks to the windfall it offers employees, it encourages them to take on second jobs and, in that way, promotes "production and employment." So it is the Board's second, "extra work" rationale at best folds right back into its first and returns us to all the problems we've already encountered.

3. "Accounting for Additional Hardships." Here the Board points to the fact that, unlike employees in termination cases, employees who face reductions in their hours and proceed to seek a second job must "adjust any outside employment hours to accommodate [the primary] employer's demands." So, for example, they have to "resolv[e] scheduling conflicts between the two jobs and traveling to a second workplace." By refusing to deduct interim earnings, the Board seems to imply, its new rule will ensure that the particular costs borne by employees in hours-reduction cases are fully compensated.

The problem is the Board's existing rules already do this. Under its existing remedial regime, the Board is indubitably free to compensate an employee for *any* costs incurred in taking on or holding a second job thanks to the employer's unlawful actions — including costs associated with resolving scheduling conflicts or traveling between workplaces. *N.L.R.B. Casehandling*

*Manual*, pt. 3, § 10555.  Indeed, the Board's order identifies no class of costs its existing remedial rules fail to capture.  And before departing from its existing rules the Board must offer some reason for doing so, some reason why its new rule might be rationally preferred to its existing authorities.  It doesn't even try.

Perhaps the Board might respond by suggesting that some costs employees suffer are intangible and incalculable — and that its new carve-out rule does a better job of compensating for such costs.  But it's far from clear the Board means to pursue such an argument.  After all, the Board itself cites by way of support the entirely tangible and calculable costs associated with "traveling to a second workplace."  And even if it were fair to read the Board as making a sort of "intangible cost" argument, it would still face its problems.  For the Board nowhere explains how its statutory charge to order backpay entails with it the authority to afford tort-like remedies for psychic and other losses not associated with lost wages.  And even on its own terms the Board's argument proves too much.  While employees in hours-reduction cases may face unique costs in traveling between and juggling two jobs, it's surely not the case that they alone suffer intangible hardships:  you might even expect the intangible human costs associated with wrongful terminations to be worse than those associated with wrongful hours-reductions.  Yet the Board's new rule seeks to distinguish between the two types of cases when it comes to intangible hardships — and does

-12-

so without offering an explanation why the one situation should receive solicitude the other does not.

4. "Preventing Dilatory Conduct." Here the Board points out that the duty to provide backpay sometimes can have unintended consequences on "the companion remedial requirement" of reinstatement — by giving employers an incentive to prolong their unlawful labor practices while an employee's interim earnings grow and the employer's corresponding backpay obligation diminishes. The Board suggests its new carve-out rule will help curb this incentive.

I don't see how. No one doubts that the Board must create remedial rules that balance between the statutorily authorized remedies of backpay and reinstatement. No one doubts either that pursuing one remedy without an eye on the other can create strange incentives like the one the Board has identified. But many decades ago the Board identified and devised a solution to the very problem it points to today. Before *In re F.W. Woolworth Co.*, 90 N.L.R.B. 289 (1950), the Board's blanket deduction of interim earnings almost perfectly achieved the policy of making employees whole when it came to backpay — they received no more and no less than they would have received at their original job. But employers would sometimes delay reinstatement to reduce their backpay obligations, a result inimical to the Board's second statutorily prescribed remedial objective and preventing "a restoration of the situation, as nearly as possible, to that which would have obtained but for the illegal discrimination." *Id.* at 292.

-13-

The Board's solution, approved by the Supreme Court in *Seven-Up*, was a quarterly deduction formula that, while sometimes resulting in a less-than-perfect award of backpay, effectively eliminated the employer's incentive to drag out reinstatement and thus achieved a reasonable balance between the Board's two remedial charges. 344 U.S. at 345-48. In our case, the Board acknowledges that it faces the same problem it solved in *Woolworth*. And it doesn't disparage the *Woolworth* solution or even question that it adequately eliminates the unwanted employer incentive. In fact, it continues to apply the *Woolworth* solution to termination cases. And (again) I just don't see how the agency might be permitted to depart from a well-established policy or eschew an obvious alternative without offering some reasoned explanation consistent with its statutory charter.

5. "Allocating Windfalls." Finally, the Board contends that, if it deducts interim earnings, employers will receive a windfall. But if it refuses to deduct interim earnings, employees will receive a windfall. One side or the other will inevitably come out better than they would have but-for the unlawful labor practice, the Board says, so it should have the discretion to allocate the windfall as it wishes. And because the employee seeking additional work is promoting production and employment through her extra effort (back once more to that doubtful rationale), that's tie-breaker enough.

This is perhaps the Board's most curious argument yet. Over eight decades the Board has taken pains to develop a set of rules that prevents windfalls for either side. To prevent employee windfalls, the Board has long deducted interim earnings. And to prevent employer windfalls, the Board's existing rules and precedents afford it the power to order the employer to (1) pay backpay without deduction if an employee chooses not to find a second job in hours-reduction cases, (2) pay any and all costs an employee incurs if she does take on a second job, and (3) ensure any backpay deductions for interim earnings are limited to the hours the employee would've worked for the wrongdoing employer. In this light, it's hard to see what windfall might fall into the employer's lap — or how, should the problem arise, the Board could not lawfully get at it. For again, the Board's existing remedial precedents and rules permit it to order compensation for *all* actual losses. Strangely, the Board ignores all this — all the careful handiwork of generations of Board members aimed at securing a tailored remedy approximating actual losses — nowhere explaining why those efforts fail only now and only in the context of hours-reduction cases.

In the end, it's difficult to come away from this case without wondering if the Board's actions stem from a frustration with the current statutory limits on its remedial powers — a frustration that it cannot pursue more tantalizing goals like punishing employers for unlawful actions or maximizing employment; that it is limited instead to the more workmanlike task of ensuring employees win backpay

awards that approximate the actual losses they've suffered.  A frustration that seems to parallel the frustration the Board experienced when it sought in *Republic Steel* and *Phelps Dodge* to issue similarly expansive extra-statutory remedies. But then as now frustration should not beget license.  In our legal order the proper avenue for addressing any dissatisfaction with congressional limits on agency authority lies in new legislation, not administrative ipse dixit.  I respectfully dissent.